## MAXWELL *v.* DOW.

176 581
178 72

### ERROR TO THE SUPREME COURT OF THE STATE OF UTAH.

No. 884.  Argued December 4, 1899. — Decided February 26, 1900.

The decision in *Hurtado* v. *California,* 110 U. S. 516, that the words "due process of law" in the Fourteenth Amendment to the Constitution of the United States do not necessarily require an indictment by a grand jury in a prosecution by a State for murder, has been often affirmed, and is now reaffirmed and applied to this case.

The privileges and immunities of citizens of the United States do not necessarily include all the rights protected by the first eight amendments to the Federal Constitution against the powers of the Federal Government.

The trial of a person accused as a criminal by a jury of only eight persons instead of twelve, and his subsequent imprisonment after conviction do not abridge his privileges and immunities under the Constitution as a citizen of the United States and do not deprive him of his liberty without due process of law.

Whether a trial in criminal cases not capital shall be by a jury composed of eight instead of twelve jurors, and whether, in case of an infamous crime, a person shall be only liable to be tried after presentment or indictment by a grand jury, are proper to be determined by the citizens of each State for themselves, and do not come within the Fourteenth Amendment to the Constitution so long as all persons within the jurisdiction of the State are made liable to be proceeded against by the same kind of procedure, and to have the same kind of trial, and the equal protection of the laws is secured to them.

THE statement of the case is in the opinion of the court.

*Mr. J. W. N. Whitecotton* for plaintiff in error.

*Mr. Alexander C. Bishop* for defendant in error. *Mr. William A. Lee* was on his brief.

MR. JUSTICE PECKHAM delivered the opinion of the court.

On the 27th of June, 1898, an information was filed against the plaintiff in error by the prosecuting attorney of the county, in a state court of the State of Utah, charging him with the crime of robbery committed within the county in May, 1898. In September, 1898, he was tried before a jury composed of but eight jurors, and convicted and sentenced to imprisonment in the state prison for eighteen years, and since that time has been confined in prison, undergoing the sentence of the state court.

In May, 1899, he applied to the Supreme Court of the State for a writ of *habeas corpus*, and alleged in his sworn petition that he was a natural-born citizen of the United States, and that his imprisonment was unlawful, because he was prosecuted under an information instead of by indictment by a grand jury, and was tried by a jury composed of eight instead of twelve jurors. He specially set up and claimed (1) that to prosecute him by information abridged his privileges and immunities as a citizen of the United States, under article 5 of the amendments to the Constitution of the United States, and also violated section 1 of article 14 of those amendments; (2) that a trial by jury of only eight persons abridged his privileges and immunities as a citizen of the United States, under article 6, and also violated section 1 of article 14 of such amendments; (3) that a trial by such a jury and his subsequent imprisonment by reason of the verdict of that jury deprived him of his liberty without due process of law, in violation of section 1 of article 14, which provides that no State shall deprive any person of life, liberty or property, without due process of law.

The Supreme Court of the State, after a hearing of the case, denied the petition for a writ, and remanded the prisoner to the custody of the keeper of the state prison, to undergo the remainder of his sentence, and he then sued out a writ of error and brought the case here.

The questions to be determined in this court are, (1) as to the validity, with reference to the Federal Constitution, of the proceeding against the plaintiff in error on an information instead of by an indictment by a grand jury; and (2) the validity of the trial of the plaintiff in error by a jury composed of eight instead of twelve jurors.

We think the various questions raised by the plaintiff in error have in substance, though not all in terms, been decided by this court in the cases to which attention will be called. The principles which have been announced in those cases clearly prove the validity of the clauses in the constitution of Utah which are herein attacked as in violation of the Constitution of the United States. It will, therefore, be necessary in this case to do but little else than call attention to the former decisions of this court, and thereby furnish a conclusive answer to the contentions of plaintiff in error.

The proceeding by information and also the trial by a jury, composed of eight jurors, were both provided for by the state constitution.

Section 13, article 1, of the constitution of Utah provides:

"Offences heretofore required to be prosecuted by indictment shall be prosecuted by information after examination and commitment by a magistrate, unless the examination be waived by the accused with the consent of the State, or by indictment, with or without such examination and commitment. The grand jury shall consist of seven persons, five of whom must concur to find an indictment; but no grand jury shall be drawn or summoned unless in the opinion of the judge of the district public interest demands it."

Section 10, article 1, of that constitution is as follows:

"In capital cases the right of trial by jury shall remain inviolate. In courts of general jurisdiction, except in capital cases, a jury shall consist of eight jurors. In courts of infe-

rior jurisdiction a jury shall consist of four jurors. In criminal cases the verdict shall be unanimous. In civil cases three fourths of the jurors may find a verdict. A jury in civil cases shall be waived unless demanded."

The objection that the proceeding by information does not amount to due process of law has been heretofore overruled, and must be regarded as settled by the case of *Hurtado* v. *California,* 110 U. S. 516. The case has since been frequently approved. *Hallinger* v. *Davis,* 146 U. S. 314, 322; *McNulty* v. *California,* 149 U. S. 645; *Hodgson* v. *Vermont,* 168 U. S. 262, 272; *Holden* v. *Hardy,* 169 U. S. 366, 384; *Brown* v. *New Jersey,* 175 U. S. 172, 176; *Bolln* v. *Nebraska,* 176 U. S. 83.

But the plaintiff in error contends that the *Hurtado case* did not decide the question whether the state law violated that clause in the Fourteenth Amendment which provides that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. Although the opinion is mainly devoted to an inquiry whether the California law was a violation of the " due process clause " of the above-mentioned-amendment, yet the matter in issue in the case was as to the validity of the state law, and the court held it valid. It was alleged by the counsel for the plaintiff in error, before the court which passed sentence, that the proceeding was in conflict with the Fifth and the Fourteenth Amendments, and those grounds were before this court. The Fifth Amendment was referred to in the opinion delivered in this court, and it was held not to have been violated by the state law, although that amendment provides for an indictment by a grand jury. This decision could not have been arrived at if a citizen of the United States were entitled, by virtue of that clause of the Fourteenth Amendment relating to the privileges and immunities of citizens of the United States, to claim in a state court that he could not be prosecuted for an infamous crime unless upon an indictment by a grand jury. In a Federal court no person can be held to answer for a capital or otherwise infamous crime unless by indictment by a grand jury, with the exceptions stated in the

Fifth Amendment. Yet this amendment was held in the *Hurtado case* not to apply to a prosecution for murder in a state court pursuant to a state law. The claim was made in the case (and referred to in the opinion) that the adoption of the Fourteenth Amendment provided an additional security to the individual against oppression by the States themselves, and limited their powers to the same extent as the amendments theretofore adopted had limited the powers of the Federal Government. By holding that the conviction upon an information was valid, the court necessarily held that an indictment was not necessary; that exemption from trial for an infamous crime, excepting under an indictment, was not one of those privileges or immunities of a citizen of the United States which a State was prohibited from abridging. The whole case was probably regarded as involved in the question as to due process of law. The particular objection founded upon the privileges and immunities of citizens of the United States is now taken and insisted upon in this case.

Under these circumstances it may not be improper to inquire as to the validity of a conviction in a state court, for an infamous crime, upon an information filed by the proper officer under the authority of the constitution and laws of the State wherein the crime was committed and the conviction took place; confining the inquiry to the question of the effect of the provision in the Fourteenth Amendment prohibiting the States from making or enforcing any law which abridges the privileges or immunities of citizens of the United States. To the other objection, that a conviction upon an information deprives a person of his liberty without due process of law, the *Hurtado case* is, as we have said, a complete and conclusive answer.

The inquiry may be pursued in connection with that in regard to the validity of the provision in the state constitution for a trial before a jury to be composed of but eight jurors in criminal cases which are not capital. One of the objections to this provision is that its enforcement has abridged the privileges and immunities of the plaintiff in error as a citizen of the United States; the other objection being that a

conviction thus obtained has resulted in depriving the plaintiff in error of his liberty without due process of law. Postponing an inquiry in regard to this last objection until we have examined the other, we proceed to inquire what are the privileges and immunities of a citizen of the United States which no State can abridge? Do they include the right to be exempt from trial, for an infamous crime, in a state court and under state authority except upon presentment by a grand jury? And do they also include the right in all criminal prosecutions in a state court to be tried by a jury composed of twelve jurors?

That a jury composed, as at common law, of twelve jurors was intended by the Sixth Amendment to the Federal Constitution, there can be no doubt. *Thompson* v. *Utah*, 170 U. S. 343, 349. And as the right of trial by jury in certain suits at common law is preserved by the Seventh Amendment, such a trial implies that there shall be an unanimous verdict of twelve jurors in all Federal courts where a jury trial is held. *American Publishing Company* v. *Fisher*, 166 U. S. 464; *Springville* v. *Thomas*, 166 U. S. 707.

It would seem to be quite plain that the provision in the Utah constitution for a jury of eight jurors in all state criminal trials, for other than capital offences, violates the Sixth Amendment, provided that amendment is now to be construed as applicable to criminal prosecutions of citizens of the United States in state courts.

It is conceded that there are certain privileges or immunities possessed by a citizen of the United States, because of his citizenship, and that they cannot be abridged by any action of the States. In order to limit the powers which it was feared might be claimed or exercised by the Federal Government, under the provisions of the Constitution as it was when adopted, the first ten amendments to that instrument were proposed to the legislatures of the several States by the first Congress on the 25th of September, 1789. They were intended as restraints and limitations upon the powers of the General Government, and were not intended to and did not have any effect upon the powers of the respective States. This has

been many times decided. The cases herewith cited are to that effect, and they cite many others which decide the same matter. *Spies* v. *Illinois*, 123 U. S. 131, 166 ; *Holden* v. *Hardy*, 169 U. S. 366, 382 ; *Brown* v. *New Jersey*, 175 U. S. 172, 174.

It is claimed, however, that since the adoption of the Fourteenth Amendment the effect of the former amendments has been thereby changed and greatly enlarged. It is now urged in substance that all the provisions contained in the first ten amendments, so far as they secure and recognize the fundamental rights of the individual as against the exercise of Federal power, are by virtue of this amendment to be regarded as privileges or immunities of a citizen of the United States, and, therefore, the States cannot provide for any procedure in state courts which could not be followed in a Federal court because of the limitations contained in those amendments. This was also the contention made upon the argument in the *Spies case*, 123 U. S. 131, 151 ; but in the opinion of the court therein, which was delivered by Mr. Chief Justice Waite, the question was not decided because it was held that the case did not require its decision.

In the *Slaughter-house cases*, 16 Wall. 36, the subject of the privileges or immunities of citizens of the United States, as distinguished from those of a particular State, was treated by Mr. Justice Miller in delivering the opinion of the court. He stated that the argument in favor of the plaintiffs, claiming that the ordinance of the city of New Orleans was invalid, rested wholly on the assumption that the citizenship is the same and the privileges and immunities guaranteed by the Fourteenth Amendment are the same as to citizens of the United States and citizens of the several States. This he showed to be not well founded ; that there was a citizenship of the United States and a citizenship of the States, which were distinct from each other, depending upon different characteristics and circumstances in the individual; that it was only privileges and immunities of the citizen of the United States that were placed by the amendment under the protection of the Federal Constitution, and that the privileges and immunities of a citizen of a State, whatever they might be, were not

intended to have any additional protection by the paragraph in question, but they must rest for their security and protection where they have heretofore rested.

He then proceeded to inquire as to the meaning of the words "privileges and immunities" as used in the amendment, and said that the first occurrence of the phrase in our constitutional history is found to be in the fourth article of the old confederation, in which it was declared "that the better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free inhabitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all the privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and egress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof respectively." A provision corresponding to this, he found in the Constitution of the United States in section 2 of the fourth article, wherein it is provided that "the citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States." What those privileges were is not defined in the Constitution, but the justice said there could be but little question that the purpose of both those provisions was the same, and that the privileges and immunities intended were the same in each. He then referred to the case of *Corfield* v. *Coryell*, decided by Mr. Justice Washington in the Circuit Court for the District of Pennsylvania, in 1823, 4 Washington C. C. 371, where the question of the meaning of this clause in the Constitution was raised. Answering the question, what were the privileges and immunities of citizens of the several States, Mr. Justice Washington said in that case:

"We feel no hesitation in confining these expressions to those privileges and immunities which are in their nature *fundamental;* which belong of right to the citizens of all free governments, and which have at all times been enjoyed by citizens of the several States which compose this Union from the time of their becoming free, independent and sovereign.

What these fundamental principles are it would be more tedi-
ous than difficult to enumerate.. They may, however, be all
comprehended under the following general heads: Protection
by the government; . . . The enjoyment of life and lib-
erty with the right to acquire and possess property of every
kind, and to pursue and obtain happiness and safety, subject,
nevertheless, to such restraints as the government may pre-
scribe for the general good of the whole."

Having shown that prior to the Fourteenth Amendment the
legislation under review would have been regarded as relat-
ing to the privileges or immunities of citizens of the State,
with which the United States had no concern, Justice Miller
continued:

"It would be the vainest show of learning to attempt to
prove by citations of authority, that up to the adoption of the
recent amendments no claim or pretence was set up that those
rights depended on the Federal government for their existence
or protection, beyond the very few express limitations which
the Federal Constitution imposed upon the States — such, for
instance, as the prohibition against *ex post facto* laws, bills of
attainder and laws impairing the obligation of contracts. But
with the exception of these and a few other restrictions, the
entire domain of the privileges and immunities of citizens of
the States, as above defined, lay within the constitutional and
legislative power of the States, and without that of the Federal
Government. Was it the purpose of the Fourteenth Amend-
ment, by the simple declaration that no State should make or
enforce any law which shall abridge the privileges and immu-
nities of citizens of the United States, to transfer the security
and protection of all the civil rights, which we have mentioned,
from the States to the Federal Government? And where it is
declared that Congress shall have the power to enforce that
article, was it intended to bring within the power of Congress
the entire domain of civil rights heretofore belonging exclu-
sively to the States?

"All this and more must follow, if the proposition of the
plaintiffs in error be sound. For not only are these rights sub-
ject to the control of Congress whenever in its discretion any

of them are supposed to be abridged by state legislation, but that body may also pass laws in advance, limiting and restricting the exercise of legislative power by the States, in their most ordinary and usual functions, as in its judgment it may think proper on all such subjects. And still further, such a construction followed by the reversal of the judgments of the Supreme Court of Louisiana in these cases, would constitute this court a perpetual censor upon all legislation of the States, on the civil rights of their own citizens, with authority to nullify such as it did not approve as consistent with those rights, as they existed at the time of the adoption of this amendment. The argument we admit is not always the most conclusive which is drawn from the consequences urged against the adoption of a particular construction of an instrument. But when, as in the case before us, these consequences are so serious, so far-reaching and pervading, so great a departure from the structure and spirit of our institutions; when the effect is to fetter and degrade the State Governments by subjecting them to the control of Congress in the exercise of power heretofore universally conceded to them of the most ordinary and fundamental character; when, in fact, it radically changes the whole theory of the relations of the State and Federal governments to each other and of both these Governments to the people; the argument has a force that is irresistible in the absence of language which expresses such a purpose too clearly to admit of doubt. We are convinced that no such results were intended by the Congress which proposed these amendments, nor by the legislatures of the States which ratified them."

If the rights granted by the Louisiana legislature did not infringe upon the privileges-or immunities of citizens of the United States, the question arose as to what such privileges were, and in enumerating some of them, without assuming to state them all, it was said that a citizen of the United States, as such, had the right to come to the seat of government to assert claims or transact business, to seek the protection of the government or to share its offices; he had the right of free access to its seaports, its various offices throughout the country, and to the courts of justice in the several States; to de-

mand the care and protection of the General Government over his life, liberty and property when on the high seas or within the jurisdiction of a foreign government; the right, with others, to peaceably assemble and petition for a redress of grievances; the right to the writ of *habeas corpus*, and to use the navigable waters of the United States, however they may penetrate the territory of the several States; also all rights secured to our citizens by treaties with foreign nations; the right to become citizens of any State in the Union by a *bona fide* residence therein, with the same rights as other citizens of that State; and the rights secured to him by the Thirteenth and Fifteenth amendments to the Constitution. A right, such as is claimed here, was not mentioned, and we may suppose it was regarded as pertaining to the State and not covered by the amendment.

Other objections to the judgment were fully examined, and the result was reached that the legislation of the State of Louisiana complained of violated no provision of the Constitution of the United States.

We have made this extended reference to the case because of its great importance, the thoroughness of the treatment of the subject, and the great ability displayed by the author of the opinion. Although his suggestion that only discrimination by a State against the negroes as a class or on account of their race was covered by the amendment as to the equal protection of the laws, has not been affirmed by the later cases, yet it was but the expression of his belief as to what would be the decision of the court when a case came before it involving that point. The opinion upon the matters actually involved and maintained by the judgment in the case has never been doubted or overruled by any judgment of this court. It remains one of the leading cases upon the subject of that portion of the Fourteenth Amendment of which it treats.

The definition of the words " privileges and immunities," as given by Mr. Justice Washington, was adopted in substance in *Paul* v. *Virginia*, 8 Wall. 168, 180, and in *Ward* v. *Maryland*, 12 Wall. 418, 430. These rights, it is said in the *Slaughter-house cases*, have always been held to be the class of

rights which the State Governments were created to establish and secure.

In the same volume as the *Slaughter-house cases* is that of *Bradwell* v. *The State*, 16 Wall. 130, where it is held that the right to practice law in the courts of a State is not a privilege or immunity of a citizen of the United States, within the meaning of the Fourteenth Amendment. And in *Minor* v. *Happersett*, 21 Wall. 162, it was held that the right of suffrage was not necessarily one of the privileges or immunities of citizenship before the adoption of the Fourteenth Amendment, and although a woman was in one sense a citizen of the United States, yet she did not obtain the right of suffrage by the adoption of that amendment. The right to vote is a most important one in our form of government, yet it is not given by the amendment.

In speaking of the meaning of the phrase " privileges and immunities of citizens of the several States," under section second, article fourth, of the Constitution, it was said by the present Chief Justice, in *Cole* v. *Cunningham*, 133 U. S. 107, that the intention was " to confer on the citizens of the several States a general citizenship, and to communicate all the privileges and immunities which the citizens of the same State would be entitled to under the like circumstances, and this includes the right to institute actions."

And in *Blake* v. *McClung*, 172 U. S. 239, 248, various cases are cited regarding the meaning of the words " privileges and immunities," under the fourth article of the Constitution, in not one of which is there any mention made of the right claimed in this case, as one of the privileges or immunities of citizens in the several States.

These cases show the meaning which the courts have attached to the expression, as used in the fourth article of the Constitution, and the argument is not labored which gives the same meaning to it when used in the Fourteenth Amendment.

That the primary reason for that amendment was to secure the full enjoyment of liberty to the colored race is not denied, yet it is not restricted to that purpose, and it applies to every

one, white or black, that comes within its provisions. But, as said in the *Slaughter-house cases*, the protection of the citizen in his rights as a citizen of the State still remains with the State. This principle is again announced in the decision in *United States* v. *Cruikshank*, 92 U. S. 542, wherein it is said that sovereignty, for the protection of the rights of life and personal liberty within the respective States, rests alone with the States. But if all these rights are included in the phrase "privileges and immunities" of citizens of the United States, which the States by reason of the Fourteenth Amendment cannot in any manner abridge, then the sovereignty of the State in regard to them has been entirely destroyed, and the *Slaughter-house cases*, and *United States* v. *Cruikshank* are all wrong, and should be overruled.

It was said in *Minor* v. *Happersett, supra*, that the amendment did not add to the privileges and immunities of a citizen; it simply furnished an additional guaranty for the protection of such as he already had. And in *In re Kemmler*, 136 U. S. 436, 448, it was stated by the present Chief Justice that —

"The Fourteenth Amendment did not radically change the whole theory of the relations of the state and Federal governments to each other, and of both governments to the people. The same person may be at the same time a citizen of the United States and a citizen of a State. Protection to life, liberty and property rests primarily, with the States, and the amendment furnishes an additional guaranty against any encroachment by the States upon those fundamental rights which belong to citizenship, and which the state governments were created to secure. The privileges and immunities of citizens of the United States, as distinguished from the privileges and immunities of citizens of the States, are indeed protected by it; but those are privileges and immunities arising out of the nature and essential character of the National government, and granted or secured by the Constitution of the United States. *United States* v. *Cruikshank*, 92 U. S. 54 *Slaughter-house cases*, 16 Wall. 36."

In Cooley's Constitutional Limitations, (4th ed. p. 497, mar ginal page 397,) the author says:

"Although the precise meaning of 'privileges and immunities' is not very conclusively settled as yet, it appears to be conceded that the Constitution secures in each State to the citizens of all other States the right to remove to and carry on business therein; the right by the usual modes to acquire and hold property, and to protect and defend the same in the law; the right to the usual remedies for the collection of debts and the enforcement of other personal rights, and the right to be exempt, in property and person, from taxes or burdens which the property or persons of citizens of the same State are not subject to."

There is no intimation here that among the privileges or immunities of a citizen of the United States are the right of trial by jury in a state court for a state offence and the right to be exempt from any trial for an infamous crime, unless upon presentment by a grand jury. And yet if these were such privileges and immunities, they would be among the first that would occur to any one when enumerating or defining them. Nor would these rights come under the description given by the Chief Justice in the *Kemmler case, supra*. Such privileges or immunities do not arise out of the nature or essential character of the National Government.

In *Walker* v. *Sauvinet*, 92 U. S. 90, it was held that a trial by jury in suits at common law in the state courts was not a privilege or immunity belonging to a person as a citizen of the United States, and protected, therefore, by the Fourteenth Amendment. The action was tried without a jury by virtue of an act of the legislature of the State of Louisiana. The plaintiff in error objected to such a trial, alleging that he had a constitutional right to a trial by jury, and that the statute was void to the extent that it deprived him of that right. The objection was overruled. Mr. Chief Justice Waite, in delivering the opinion of the court, said:

"By article 7 of the amendments it is provided that 'in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.' This, as has been many times decided, relates only to trials in the courts of the United States. *Edwards* v. *Elliott*, 21 Wall.

532, 557. The States, so far as this amendment is concerned, are left to regulate trials in their own courts in their own way. A trial by jury in suits at common law pending in the state courts is not, therefore, a privilege or immunity of national citizenship, which the States are forbidden by the Fourteenth Amendment to abridge. A State cannot deprive a person of his property without due process of law; but this does not necessarily imply that all trials in the state courts affecting the property of persons must be by jury. This requirement of the Constitution is met if the trial is had according to the settled course of judicial proceedings. *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 280. Due process of law is process due according to the law of the land. This process in the States is regulated by the law of the State. Our power over that law is only to determine whether it is in conflict with the supreme law of the land — that is to say, with the Constitution and laws of the United States made in pursuance thereof — or with any treaty made under the authority of the United States."

This case shows that the Fourteenth Amendment in forbidding a State to abridge the privileges or immunities of citizens of the United States, does not include among them the right of trial by jury in a civil case, in a state court, although the right to such a trial in the Federal courts is specially secured to all persons in the cases mentioned in the Seventh Amendment.

Is any one of the rights secured to the individual by the Fifth or by the Sixth Amendment any more a privilege or immunity of a citizen of the United States than are those secured by the Seventh? In none are they privileges or immunities granted and belonging to the individual as a citizen of the United States, but they are secured to all persons as against the Federal Government, entirely irrespective of such citizenship. As the individual does not enjoy them as a privilege of citizenship of the United States, therefore, when the Fourteenth Amendment prohibits the abridgment by the States of those privileges or immunities which he enjoys as such citizen, it is not correct or reasonable to say that it covers and extends to

certain rights which he does not enjoy by reason of his citizenship, but simply because those rights exist in favor of all individuals as against Federal govermental powers.   The nature or character of the right of trial by jury is the same in a criminal prosecution as in a civil action, and in neither case does it spring from nor is it founded upon the citizenship of the individual as a citizen of the United States, and if not, then it cannot be said that in either case it is a privilege or immunity which alone belongs to him as such citizen.

So it was held in the oyster planting case, *McCready* v. *Virginia*, 94 U. S. 391, that the right which the people of that State acquired to appropriate its tide waters and the beds therein for taking and cultivating fish, was but a regulation of the use, by the people, of their common property, and the right thus acquired did not come from their citizenship alone, but from their citizenship and property combined. It was, therefore, a property right and not a mere privilege or immunity of citizenship, and, for that reason, the citizen of one State was not invested by the Constitution of the United States with any interest in the common property of the citizens of another State.

This was a decision under another section of the Constitution (section second of article fourth) from the one under discussion, and it gives to the citizens of each State all privileges and immunities of citizens of the several States, but it is cited for the purpose of showing that where the privilege or immunity does not rest alone upon citizenship, a citizen of another State does not participate therein.

In this case the privilege or immunity claimed does not rest upon the individual by virtue of his national citizenship, and hence is not protected by a clause which simply prohibits the abridgment of the privileges or immunities of citizens of the United States.   Those are not distinctly privileges or immunities of such citizenship, where every one has the same as against the Federal Government, whether citizen or not.

The Fourteenth Amendment, it must be remembered, did not add to those privileges or immunities.   The *Sauvinet case* is an authority in favor of the contention that the amendment

does not preclude the States by their constitutions and laws from altering the rule as to indictment by a grand jury, or as to the number of jurors necessary to compose a petit jury in a criminal case not capital.

The same reasoning is applicable to the case of *Kennard* v. *Louisiana*, 92 U. S. 480, although that case was decided with special reference to the "due process of law" clause.

In *Kemmler's case*, 136 U. S. 436, it was stated that it was not contended and could not be that the Eighth Amendment to the Federal Constitution was intended to apply to the States. This was said long after the adoption of the Fourteenth Amendment, and also subsequent to the making of the claim that by its adoption the limitations of the preceding amendments had been altered and enlarged so as in effect to make them applicable to proceedings in the state courts.

In *Presser* v. *Illinois*, 116 U. S. 252, it was held that the Second Amendment to the Constitution, in regard to the right of the people to bear arms, is a limitation only on the power of Congress and the National Government, and not of the States. It was therein said, however, that as all citizens capable of bearing arms constitute the reserved military force of the National Government, the States could not prohibit the people from keeping and bearing arms, so as to deprive the United States of their rightful resource for maintaining the public security, and disable the people from performing their duty to the General Government.

In *O'Neil* v. *Vermont*, 144 U. S. 323, 332, it was stated that as a general question it has always been ruled that the Eighth Amendment to the Constitution of the United States does not apply to the States.

In *Thorington* v. *Montgomery*, 147 U. S. 490, it was said that the Fifth Amendment to the Constitution operates exclusively in restraint of Federal power, and has no application to the States.

We have cited these cases for the purpose of showing that the privileges and immunities of citizens of the United States do not necessarily include all the rights protected by the first eight amendments to the Federal Constitution against the

powers of the Federal Government. They were decided subsequently to the adoption of the Fourteenth Amendment, and if the particular clause of that amendment, now under consideration, had the effect claimed for it in this case, it is not too much to say that it would have been asserted and the principles applied in some of them.

It has been held that the last clause of the Seventh Amendment, which provides that no fact tried by a jury shall be otherwise reëxamined in any court of the United States, than according to the rules of the common law, is not confined to trials by jury in Federal courts, but applies equally to a cause tried before a jury in a state court and brought thence before a Federal court. *The Justices* v. *Murray*, 9 Wall. 274; *Chicago, Burlington &c. Railroad* v. *Chicago*, 166 U. S. 226; *Capital Traction Company* v. *Hof*, 174 U. S. 1. But these decisions only carry out the idea that the amendment is a restraint upon Federal power, and not upon the power of the State, inasmuch as they declare that the clause restricts the right of the Federal courts to reëxamine the facts found by a jury in a state court, as well as in a Federal one.

In *Missouri* v. *Lewis*, 101 U. S. 22, it was held that the clause of the Fourteenth Amendment, which prohibits a State from denying to any person the equal protection of the laws, did not thereby prohibit the State from prescribing the jurisdiction of its several courts either as to their territorial limits or the subject-matter, or amount or finality of their respective judgments or decrees; that a State might establish one system of law in one portion of its territory and another system in another, provided it did not encroach upon the proper jurisdiction of the United States, nor abridge the privileges or immunities of citizens of the United States, nor deny to any person within its jurisdiction the equal protection of the laws in the same district, nor deprive him of his rights without due process of law. In the course of the opinion, which was delivered by Mr. Justice Bradley, he said :

" We might go still further and say, with undoubted truth, that there is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for

all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. This would not of itself, within the meaning of the Fourteenth Amendment, be a denial to any person of the equal protection of the laws. If every person residing or being in either portion of the State should be accorded the equal protection of the laws prevailing there he could not justly complain of a violation of the clause referred to. For, as before said, it has respect to persons and classes of persons. It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances. The Fourteenth Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated only by an imaginary line. On one side of this line there may be a right of trial by jury, and on the other side no such right. Each State prescribes its own modes of judicial proceeding. If diversities of laws and judicial proceedings may exist in the several States without violating the equality clause in the Fourteenth Amendment, there is no solid reason why there may not be such diversities in different parts of the same State. A uniformity which is not essential as regards different States cannot be essential as regards different parts of a State, provided that in each and all there is no infraction of the constitutional provision. Diversities which are allowable in different States are allowable in different parts of the same State. Where part of a State is thickly settled, and another part has but few inhabitants, it may be desirable to have different systems of judicature for the two portions — trial by jury in one, for example, and not in the other. Large cities may require a multiplication of courts and a peculiar arrangement of jurisdictions. It would be an unfortunate restriction of the powers of the state government if it could not, in its

discretion, provide for these various exigencies.  If a Mexican State should be acquired by treaty and added to an adjoining State or part of a State in the United States, and the two should be erected into a new State, it cannot be doubted that such new State might allow the Mexican laws and judicature to continue unchanged in the one portion, and the common law and its corresponding judicature in the other portion. Such an arrangement would not be prohibited by any fair construction of the Fourteenth Amendment.  It would not be based on any respect of persons or classes, but on munici-pal considerations alone, and a regard for the welfare of all classes within the particular territory or jurisdiction."

Although this case was principally discussed under that clause of the Fourteenth Amendment which prohibits a State from denying to any person within its jurisdiction the equal protection of the laws, yet the application of the amendment with regard to the privileges or immunities of citizens of the United States was also referred to, and if it had been supposed that it secured to a citizen of the United States, when pro-ceeded against under state authority, all the privileges and immunities set forth in the first eight amendments to the Federal Constitution, Mr. Justice Bradley could not, in the course of his opinion in the case, have said that a trial by jury might exist as a right in one State and not exist in another. Trial by jury would in such case have been protected under the Fourteenth Amendment, because it was granted to all persons by article six in all criminal prosecutions in the Federal courts, and by article seven in civil actions at common law, where the value in controversy should exceed twenty dollars.  On the con-trary, it was stated that great diversity in these respects might exist in two States separated only by an imaginary line, on one side of which there might be a right of trial by jury, and on the other side no such right.  Each State, it was said, pre-scribes its own modes of judicial procedure.  The decision of this case was by a unanimous court, and the remarks of the justice are wholly irreconcilable with the existence of a right of trial by jury in a state court which was guaranteed and pro-tected by the Fourteenth Amendment, notwithstanding the

denial of such right by and under the constitution and laws of the State.

The principle to be deduced from these various cases is that the rights claimed by the plaintiff in error rest with the state governments, and are not protected by the particular clause of the amendment under discussion. What protection may be afforded the individual against state legislation or the procedure in state courts or tribunals under other clauses of the amendment, we do not now inquire, as what has been heretofore said is restricted to the particular clause of that amendment which is now spoken of, the privileges or immunities of citizens of the United States.

Counsel for plaintiff in error has cited from the speech of one of the Senators of the United States, made in the Senate when the proposed Fourteenth Amendment was under consideration by that body, wherein he stated that among the privileges and immunities which the committee having the amendment in charge sought to protect against invasion or abridgment by the States, were included those set forth in the first eight amendments to the Constitution, and counsel has argued that this court should, therefore, give that construction to the amendment which was contended for by the Senator in his speech.

What speeches were made by other Senators, and by Representatives in the House, upon this subject is not stated by counsel, nor does he state what construction was given to it, if any, by other members of Congress. It is clear that what is said in Congress upon such an occasion may or may not express the views of the majority of those who favor the adoption of the measure which may be before that body, and the question whether the proposed amendment itself expresses the meaning which those who spoke in its favor may have assumed that it did, is one to be determined by the language actually therein used and not by the speeches made regarding it.

What individual Senators or Representatives may have urged in debate, in regard to the meaning to be given to a proposed constitutional amendment, or bill or resolution, does not furnish a firm ground for its proper construction, nor is it important

as explanatory of the grounds upon which the members voted in adopting it.   *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290, 318; *Dunlap* v. *United States*, 173 U. S. 65, 75.

In the case of a constitutional amendment it is of less materiality than in that of an ordinary bill or resolution.   A constitutional amendment must be agreed to, not only by Senators and Representatives, but it must be ratified by the legislatures, or by conventions, in three fourths of the States before such amendment can take effect.   The safe way is to read its language in connection with the known condition of affairs out of which the occasion for its adoption may have arisen, and then to construe it, if there be therein any doubtful expressions, in a way so far as is reasonably possible, to forward the known purpose or object for which the amendment was adopted.   This rule could not, of course, be so used as to limit the force and effect of an amendment in a manner which the plain and unambiguous language used therein would not justify or permit.

.For the reasons stated, we come to the conclusion that the clause under consideration does not affect the validity of the Utah constitution and legislation.

The remaining question is, whether in denying the right of an individual, in all criminal cases not capital, to have a jury composed of twelve jurors, the State deprives him of life, liberty or property, without due process of law.

This question is, as we believe, substantially answered by the reasoning of the opinion in the *Hurtado case, supra.* The distinct question was there presented whether it was due process of law to prosecute a person charged with murder by an information under the state constitution and law.   It was held that it was, and that the Fourteenth Amendment did not prohibit such a procedure.   In our opinion the right to be exempt from prosecution for an infamous crime, except upon a presentment by a grand jury, is of the same nature as the right to a petit jury of the number fixed by the common law. If the State have the power to abolish the grand jury and the consequent proceeding by indictment, the same course of rea-

soning which establishes that right will and does establish the right to alter the number of the petit jury from that provided by the common law. Many cases upon the subject since the *Hurtado case* was decided are to be found gathered in *Hodgson* v. *Vermont,* 168 U. S. 262; *Holden* v. *Hardy,* 169 U. S. 366, 384; *Brown* v. *New Jersey,* 175 U. S. 172; *Bolln* v. *Nebraska,* 176 U. S. 83.

Trial by jury has never been affirmed to be a necessary requisite of due process of law. In not one of the cases cited and commented upon in the *Hurtado case* is a trial by jury mentioned as a necessary part of such process.

In *In re Converse,* 137 U. S. 624, it was stated that the Fourteenth Amendment was not designed to interfere with the power of a State to protect the lives, liberty and property of its citizens, nor with the exercise of that power in the adjudications of the courts of a State in administering process provided by the law of the State.

In *Caldwell* v. *Texas,* 137 U. S. 692, it was held that no State can deprive particular persons or classes of persons of equal and impartial justice under the law, without violating the provisions of the Fourteenth Amendment to the Constitution, and that due process of law, within the meaning of the Constitution, is secured when the laws operate on all alike, and no one is subjected to partial or arbitrary exercise of the powers of government.

In *Leeper* v. *Texas,* 139 U. S. 462, 467, it was said " that by the Fourteenth Amendment the powers of States in dealing with crime within their borders are not limited, except that no State can deprive particular persons, or class of persons, of equal and impartial justice under the law; that law in its regular course of administration through courts of justice is due process, and when secured by the law of the State the constitutional requirement is satisfied; and that due process is so secured by laws operating on all alike, and not subjecting the individual to the arbitrary exercise of the powers of government unrestrained by the established principles of private right and distributive justice. *Hurtado* v. *California,* 110 U. S. 516, 535, and cases cited." See also for statement

as to due process of law the cases of *Davidson* v. *New Orleans,* 96 U. S. 97; *Hagar* v. *Reclamation District,* 111 U. S. 701, 707.

The clause has been held to extend to a proceeding conducted to judgment in a state court under a valid statute of the State, if such judgment resulted in the taking of private property for public use, without compensation made or secured to the owner, under the conditions mentioned in the cases herewith cited. *Chicago, Burlington &c. Railroad* v. *Chicago,* 166 U. S. 226; *Backus* v. *Fort Street Union Depot Company,* 169 U. S. 557.

It has also been held not to impair the police power of a State. *Barbier* v. *Connolly,* 113 U. S. 27.

It appears to us that the questions whether a trial in criminal cases not capital shall be by a jury composed of eight instead of twelve jurors, and whether in case of an infamous crime a person shall only be liable to be tried after presentment or indictment of a grand jury, are eminently proper to be determined by the citizens of each State for themselves, and do not come within the clause of the amendment under consideration, so long as all persons within the jurisdiction of the State are made liable to be proceeded against by the same kind of procedure and to have the same kind of trial, and the equal protection of the laws is secured to them. *Caldwell* v. *Texas,* 137 U. S. 692; *Leeper* v. *Texas,* 139 U. S. 462. It is emphatically the case of the people by their organic law, providing for their own affairs, and we are of opinion they are much better judges of what they ought to have in these respects than any one else can be. The reasons given in the learned and most able opinion of Mr. Justice Matthews, in the *Hurtado case,* for the judgment therein rendered, apply with equal force in regard to a trial by a jury of less than twelve jurors. The right to be proceeded against only by indictment, and the right to a trial by twelve jurors, are of the same nature, and are subject to the same judgment, and the people in the several States have the same right to provide by their organic law for the change of both or either. Under this construction of the

amendment there can be no just fear that the liberties of the citizen will not be carefully protected by the States respectively. It is a case of self-protection, and the people can be trusted to look out and care for themselves. There is no reason to doubt their willingness or their ability to do so, and when providing in their constitution and legislation for the manner in which civil or criminal actions shall be tried, it is in entire conformity with the character of the Federal Government that they should have the right to decide for themselves what shall be the form and character of the procedure in such trials, whether there shall be an indictment or an information only, whether there shall be a jury of twelve or a lesser number, and whether the verdict must be unanimous or not. These are matters which have no relation to the character of the Federal Government. As was stated by Mr. Justice Brewer, in delivering the opinion of the court in *Brown* v. *New Jersey*, 175 U. S. 172, the State has full control over the procedure in its courts, both in civil and criminal cases, subject only to the qualification that such procedure must not work a denial of fundamental rights or conflict with specific and applicable provisions of the Federal Constitution. The legislation in question is not, in our opinion, open to either of these objections.

Judged by the various cases in this court we think there is no error in this record, and the judgment of the Supreme Court of Utah must, therefore, be

*Affirmed.*

Mr. Justice Harlan, dissenting.

Under an information filed against him in one of the courts of the State of Utah, Maxwell, the plaintiff in error, a citizen of the United States, was convicted of the crime of robbery, and having been tried by a jury consisting of eight persons was found guilty and sentenced to confinement in the penitentiary for the term of eighteen years.

He insists that his imprisonment is in violation of the Constitution of the United States in that he was proceeded against by information — not by indictment or presentment of a grand

jury — and was tried for an infamous crime by a jury composed of less than twelve persons.

By its opinion and judgment juŝt rendered this court holds that neither the prosecution by information nor the trial by eight jurors was in violation of the Constitution of the United States.

Upon the first point I do not care to say anything. For, in *Hurtado* v. *California*, 110 U. S. 516, this court held that a state enactment authorizing the prosecution by information for the crime of murder in the first degree —. the penalty for such crime being death — was not in violation of the Constitution of the United States. The principles there announced have been reaffirmed in later cases. In the *Hurtado case* I dissented from the opinion and judgment of the court and stated fully the reasons why, in my judgment, no civil tribunal or court, Federal or state, could legally try a citizen of the United States for an infamous crime otherwise than on the indictment or presentment of a grand jury. I adhere to the views then expressed, but further discussion of the question decided seems unnecessary.

The remaining question in the present case is whether the trial of the accused by eight jurors is forbidden by the Constitution of the United States.

The Fourteenth Amendment, after declaring that all persons born or naturalized in the United States and subject to the jurisdiction thereof are citizens of the United States and of the State wherein they reside, provides that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States," nor "shall any State deprive any person of life, liberty or property without due process of law."

What are the privileges and immunities of "citizens of the United States"? Without attempting to enumerate them, it ought to be deemed safe to say that such privileges and immunities embrace at least those expressly recognized by the Constitution of the United States and placed beyond the power of Congress to take away or impair.

When the Constitution was adopted by the Convention of

1787 and placed before the people for their acceptance or rejection, many wise statesmen whose patriotism no one then questioned or now questions earnestly objected to its acceptance upon the ground that it did not contain a Bill of Rights guarding the fundamental guarantees of life, liberty and property against the unwarranted exercise of power by the National Government. But the friends of the Constitution, believing that the failure to accept it would destroy all hope for permanent union among the people of the original States, and following the advice of Washington who was the leader of the constitutional forces, met this objection by showing that when the Constitution had been accepted by the requisite number of States and thereby become the supreme law of the land, such amendments could be adopted as would relieve the apprehensions of those who deemed it necessary, by express provisions, to guard against the infringement by the agencies of the General Government of any of the essential rights of American freemen. This view prevailed, and the implied pledge thus given was carried out by the first Congress, which promptly adopted and submitted to the people of the several States the first ten amendments. These amendments have ever since been regarded as the National Bill of Rights.

Let us look at some of those amendments. It is declared by the First, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press, or the right of the people peaceably to assemble and to petition the Government for a redress of grievances;" by the Third, "no soldier shall in time of peace be quartered in any house, without the consent of the owner, nor in time of war, but in a manner to be prescribed by law;" by the Fourth, "the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated, and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized;" by the Fifth, no person shall "be subject for the same offence to be twice put in jeopardy of life or limb, nor shall he be compelled

in any criminal case to be a witness against himself, nor be deprived of life, liberty or property without due process of law, nor shall private property be taken for public use, without just compensation;" by the Sixth, "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence;" and by the Eighth, "excessive bail shall not be required nor excessive fines imposed, nor cruel and unusual punishments inflicted."

It seems to me that the privileges and immunities enumerated in these amendments belong to every citizen of the United States. They were universally so regarded prior to the adoption of the Fourteenth Amendment. In order to form a more perfect union, establish justice, insure domestic tranquillity, provide for the common defence, promote the general welfare and secure the blessings of liberty to themselves and their posterity, the political community known as the People of the United States ordained and established the Constitution of the United States; and every member of that political community was a citizen of the United States. It was that community that adopted, in the mode prescribed by the Constitution, the first ten amendments; and what they had in view by so doing was to make it certain that the privileges and immunities therein specified — the enjoyment of which, the fathers believed, were necessary in order to secure the blessings of liberty — could never be impaired or destroyed by the National Government.

Now, the original Constitution declared that "the trial of all crimes, except in cases of impeachment, shall be by jury." This was supplemented by the Sixth Amendment, declaring that in all criminal prosecutions the accused should enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime was committed. And

we have held that the jury here referred to was a common law jury consisting of neither more or less than twelve persons, whose unanimous verdict was necessary to acquit or convict the accused; that a jury of less number was not admissible in any criminal trial in the District of Columbia or in a Territory of the United States, or in any prosecution of a criminal character in a court of the United States or in any court organized under the authority of the United States. *Callan* v. *Wilson*, 127 U. S. 540; *Thompson* v. *Utah*, 170 U. S. 343: We have often adjudged that the declaration in Magna Charta that the King would not pass upon any freeman, nor condemn him, "but by the lawful judgment of his peers," referred to a jury of twelve persons.

It is not difficult to understand why the fathers intrenched the right of trial by jury in the supreme law of the land. They regarded the recognition and exercise of that right as vital to the protection of liberty against arbitrary power. Mr. Hallam in his Constitutional History of England, after observing that liberty had been the slow fruit of ages, said that as early as the reign of Henry VII one of the essential checks upon royal power was that " the fact of guilt or innocence on a criminal charge was determined in a public court, and in the county where the offence was alleged to have occurred, by a jury of twelve men, from whose unanimous verdict no appeal could be made." And it is an interesting fact that the first ordinance adopted by the Plymouth Colony in 1623 was one declaring among other things that " all criminal facts " should be tried " by the verdict of twelve honest men to be impaneled by authority, in form of a jurye upon their oaths." The value of that institution was recognized by the patriotic men of the Revolutionary period when in the Declaration of Independence they complained that the King of Great Britain had deprived the people of the Colonies in many cases of the benefits of trial by jury. Referring to the provisions of the Federal Constitution relating to the personal security of citizens of the United States, Kent says they "must be regarded as fundamental in every State, for the colonies were parties to the national declaration of rights in 1774, in which the trial by

jury, and the other rights and liberties of English subjects were peremptorily claimed as their undoubted inheritance and birth-right." Upon this general subject. Mr. Justice Story in his Commentaries on the Constitution has said : " It was under the consciousness of the full possession of the rights, liberties and immunities of British subjects, that the colonists in almost all the early legislation of their respective assemblies insisted upon a declaratory act, acknowledging and confirming them. And for the most part they thus succeeded in obtaining a real and effective Magna Charta of their liberties. The trial by jury in all cases, civil and criminal, was as firmly and universally established in the colonies as in the mother country." 1 Story's Const. § 165. Again, the same eminent jurist says : " It seems hardly necessary in this place to expatiate upon the antiquity or importance of the trial by jury in criminal cases. It was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties, and watched with an unceasing jealousy and solicitude. The right constitutes one of the fundamental articles of Magna Charta, in which it is declared, *nullus homo capiatur, nec imprisonetur, aut exuletur, aut aliquo modo destruatur, &c. ; nisi per legale judicium parium suorum, vel per legem terræ;* no man shall be arrested, nor imprisoned, nor banished, nor deprived of life, etc., but by the judgment of his peers, or by the law of the land. The judgment of his peers here alluded to, and commonly called, in the quaint language of former times, a trial *per pais,* or trial by the country, is the trial by a jury, who are called the peers of the party accused, being of the like condition and equality in the State. When our more immediate ancestors removed to America, they brought this privilege with them, as their birthright and inheritance, as a part of that admirable common law which had fenced round and interposed barriers on every side against the approaches of arbitrary power. It is now incorporated into all our state constitutions as a fundamental right, and the Constitution of the United States would have been justly obnoxious to the most conclusive objection if it had not recognized and confirmed it in the most solemn terms. The great object of a trial by jury

in criminal cases is to guard against a spirit of oppression and tyranny on the part of rulers, and against a spirit of violence and vindictiveness on the part of the people. Indeed, it is often more important to guard against the latter than the former." 2 Story's Const. § 1779. ;Blackstone has said: " A celebrated French writer, who concludes that because Rome, Sparta and Carthage have lost their liberties, therefore those of England in time must perish, should have recollected that Rome, Sparta and Carthage, at the time when their liberties were lost, were strangers to the trial by jury." 2 Bl. Com. 379. In a recent American work on trial by jury the author well says: " The English colonists settled here with a deep-rooted regard for this right. It had been, no doubt, to them in the mother country a valuable protection. They brought it with them and established it as one of their dearest privileges, and in every enumeration of their rights and immunities it takes a conspicuous place." Again, the same author: " Ever since Magna Charta, the right to a trial by jury has been esteemed a peculiarly dear and inestimable privilege by the English race; and whether in a strictly historical view the right was defined or secured by that instrument or not, it was nevertheless invariably appealed to and implicitly relied on as unalterably and inviolably securing the right among other valuable privileges guaranteed therein. During long centuries, when popular rights were overborne by prerogative or despotism, those who claimed and were denied the right to such a trial, founded their demand on the guarantee of the Great Charter, and solemnly protested against its violation when the privilege was denied them; and whenever an invasion or violation of individual rights was threatened, the security afforded by this guarantee was relied on as an effectual safeguard either to repel the attack or nullify its effect." Proffat on Jury Trials, §§ 81, 82. And this court has declared that " the trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy." *Parsons* v. *Bedford,* 3 Pet. 433, 446.

Notwithstanding this history of the incorporation into the

Constitution of the United States of the provision relating to trial by jury, it is now adjudged that immunity from trial for crime except by a jury of twelve jurors is not an immunity belonging to citizens of the United States within the meaning of the Fourteenth Amendment.

It does not solve the question before us to say that the first ten amendments had reference only to the powers of the National Government and not to the powers of the States. For if prior to the adoption of the Fourteenth Amendment it was one of the privileges or immunities of citizens of the United States that they should not be tried for crime in any court organized or existing under National authority except by a jury composed of twelve persons, how can it be that a citizen of the United States may be now tried in a state court for crime, particularly for an infamous crime, by eight jurors, when that amendment expressly declares that "no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States"? It does not meet the case to say that a trial by eight jurors is as much a trial by jury as if there were twelve jurors; for if a citizen charged with crime can be subjected to trial by a less number of jurors than that prescribed by the Constitution, the number may be reduced to three. Indeed, under the interpretation now given to the amendment, it will, I think, be impossible to escape the conclusion that a State may abolish trial by jury altogether in a criminal case, however grave the offence charged, and authorize the trial of a case of felony before a single judge. I cannot assent to this interpretation, because it is opposed to the plain words of the Constitution, and defeats the manifest object of the Fourteenth Amendment.

I am of opinion that under the original Constitution and the Sixth Amendment, it is one of the privileges and immunities of citizens of the United States that when charged with crime they shall be tried only by a jury composed of twelve persons; consequently, a state statute authorizing the trial by a jury of eight persons of a citizen of the United States, charged with crime, is void under the Fourteenth Amendment declaring that no State shall make or enforce any law that

"shall abridge the privileges or immunities of citizens of the United States."

I am also of opinion that the trial of the accused for the crime charged against him by a jury of eight persons was not consistent with the "due process of law" prescribed by the Fourteenth Amendment. Referring to the words in the Fifth Amendment, that "no person shall be deprived of life, liberty or property without due process of law," this court said in *Murray's Lessee* v. *Hoboken,* 18 How. 272, 276–7: "The Constitution contains no description of those processes which it was intended to allow or forbid. It does not even declare what principles are to be applied to ascertain whether it be due process. It was manifest that it was not left to the legislative power to enact any process which might be devised. The article is a restraint on the legislative as well as on the executive and judicial powers of the Government, and cannot be so construed as to leave Congress free to make any process 'due process of law' by its mere will. To what principles are we to resort to ascertain whether this process enacted by Congress is due process? To this the answer must be twofold. We must examine the Constitution itself to see whether this process be in conflict with any of its provisions. If not found to be so, we must look *to those settled usages and modes of proceeding existing in the common and statute law of England before the emigration of our ancestors,* and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country."

No one, I think, can produce any authority to show that according to the "settled usages and modes of proceeding existing in the common and statute law of England before the emigration of our ancestors," the trial of one accused of felony otherwise than by a jury of twelve, or wholly without a jury, was consistent with "due process of law." If the original Constitution had not contained a specific prohibition of trials for crime otherwise than by a jury, the requirement of due process of law in the Fifth Amendment would have stood in the way of any act of Congress authorizing criminal trials in the

Federal courts in any mode except by a common law jury. When therefore the Fourteenth Amendment forbade the deprivation by any State of life, liberty or property without due process of law, the intention was to prevent any State from infringing the guarantees for the protection of life and liberty that had already been guarded against infringement by the National Government.

This interpretation of the Fourteenth Amendment finds support in some of the decisions of this court. In addition to the clause forbidding the deprivation of property " without due process of law," there is in the Fifth Amendment a clause specifically declaring "nor shall private property be taken for public use without just compensation." The Fourteenth Amendment does not in terms refer to the taking of private property for public use, yet we have held that the requirement of " due process of law " *in that amendment* forbids the taking of private property for public use without making or securing just compensation. *Chicago, Burlington &c. Railroad* v. *Chicago,* 166 U. S. 226, 233, 241 ; *Norwood* v. *Baker,* 172 U. S. 269, 277.

If then the " due process of law " required by the Fourteenth Amendment does not allow a State to take private property without just compensation, but does allow the life or liberty of the citizen to be taken in a mode that is repugnant to the settled usages and the modes of proceeding authorized at the time the Constitution was adopted and which was expressly forbidden in the National Bill of Rights, it would seem that the protection of private property is of more consequence than the protection of the life and liberty of the citizen.

If the court had not ruled otherwise, I should have thought it indisputable that when by the Fourteenth Amendment it was declared that no State should make or enforce any law abridging the privileges or immunities of citizens of the United States, nor deprive any person of life, liberty or property without due process of law, the people of the United States put upon the States the same restrictions that had been imposed upon the National Government in respect as well of the privileges and immunities of citizens of the United States as of

the protection of the fundamental rights of life, liberty and property.

The decision to-day rendered is very far reaching in its consequences. I take it no one doubts that the great men who laid the foundations of our Government regarded the preservation of the privileges and immunities specified in the first ten amendments as vital to the personal security of American citizens. To say of any people that they do not enjoy those privileges and immunities is to say that they do not enjoy real freedom. But suppose a State should prohibit the free exercise of religion; or abridge the freedom of speech or of the press; or forbid its people from peaceably assembling to petition the government for a redress of grievances; or authorize soldiers in time of peace to be quartered in any house without the consent of the owner; or permit the persons, houses, papers and effects of the citizen to be subjected to unreasonable searches and seizures under warrants not issued upon probable cause nor supported by oath or affirmation, nor describing the place to be searched and the persons or things to be seized; or allow a person to be twice put in jeopardy of life or limb; or compel the accused to be a witness against himself; or deny to the accused the right to be informed of the nature and cause of the accusation against him, to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, or to have the assistance of counsel; or require excessive bail; or inflict cruel and unusual punishment. These or any of these things being done by a State, this court, according to the reasoning and legal effect of the opinion just delivered, would be bound to say that the privileges and immunities specified were not privileges and immunities of citizens of the United States within the meaning of the Fourteenth Amendment, and that citizens of the United States affected by the action of the State could not invoke the protection of that amendment or of any other provision of the National Constitution. Suppose the State of Utah should amend its constitution and make the Mormon religion the established religion of the State, to be supported by taxation on all the people of Utah. Could its right to do

OCTOBER TERM, 1899.

so, as far as the Constitution of the United States is concerned, be gainsayed under the principles of the opinion just delivered? If such an amendment were alleged to be invalid under the National Constitution, could not the opinion herein be cited as showing that the right to the free exercise of religion was not a privilege of a "citizen of the United States" within the meaning of the Fourteenth Amendment? Suppose, again, a State should prescribe as a punishment for crime burning at the stake or putting out the eyes of the accused. Would this court have any alternative under the decision just rendered but to say that the immunity from cruel and unusual punishments recognized in the Eighth Amendment as belonging to every citizen of the United States was not an immunity of a citizen within the meaning of the Fourteenth Amendment and was not protected by that amendment against impairment by the State? The privileges and immunities specified in the first ten amendments as belonging to the people of the United States are equally protected by the Constitution. No judicial tribunal has authority to say that some of them may be abridged by the States while others may not be abridged. If a State can take from the citizen charged with crime the right to be tried by a jury of twelve persons, it can, so far as the Constitution of the United States is concerned, take away the remaining privileges and immunities specified in the National Bill of Rights. There is no middle position, unless it be assumed to be one of the functions of the judiciary by an interpretation of the Constitution to mitigate or defeat what its members may deem the erroneous or unwise action of the people in adopting the Fourteenth Amendment. The court cannot properly say that the Constitution of the United States does not protect the citizen when charged with crime in a state court against trial otherwise than by a jury of twelve persons, but does protect him against cruel and unusual punishment, or against being put twice in jeopardy of life or limb for the same offence, or against being compelled to testify against himself in a criminal prosecution, or in freedom of speech or in the free exercise of religion. The right to be tried when charged with crime by a jury of twelve persons

is placed by the Constitution upon the same basis as the other rights specified in the first ten amendments. And while those amendments originally limited only the powers of the National Government in respect of the privileges and immunities specified therein, since the adoption of the Fourteenth Amendment those privileges and immunities are, in my opinion, also guarded against infringement by the States.

If it be said that there need be no apprehension that any State will strike down the guarantees of life and liberty which are found in the National Bill of Rights, the answer is that the plaintiff in error is now in the penitentiary of Utah as the result of a mode of trial that would not have been tolerated in England at the time American independence was achieved, nor even now, and would have caused the rejection of the Constitution by every one of the original States if it had been sanctioned by any provision in that instrument when it was laid before the people for acceptance or rejection. Liberty, it has been well said, depends not so much upon the absence of actual oppression as on the existence of constitutional checks upon the power to oppress. These checks should not be destroyed or impaired by judicial decisions. On the contrary, speaking by Mr. Justice Bradley, we have declared in *Boyd* v. *United States*, 116 U. S. 616, 636, that "it is the duty of the courts to be watchful for the constitutional rights of the citizen." If some of the guarantees of life, liberty and property which at the time of the adoption of the National Constitution were regarded as fundamental and as absolutely essential to the enjoyment of freedom, have in the judgment of some ceased to be of practical value, it is for the people of the United States so to declare by an amendment of that instrument. But, if I do not wholly misapprehend the scope and legal effect of the present decision, the Constitution of the United States does not stand in the way of any State striking down guarantees of life and liberty that English-speaking people have for centuries regarded as vital to personal security, and which the men of the Revolutionary period universally claimed as the birthright of freemen.

I dissent from the opinion and judgment of the court.