COUNTY COURT JUDGES ASSOCIA-
TION and State of Wyoming, ex rel.
County Court Judges Association, Peti-
tioners (Plaintiffs),

v.

Jack SIDI, Wyoming State Auditor,
Respondent (Defendant).

No. 87–203.

Supreme Court of Wyoming.

March 30, 1988.

John J. Rooney of Rooney, Bagley, Hick-
ey, Evans & Statkus, Cheyenne, for peti-
tioners.

Joseph B. Meyer, Atty. Gen., and Sylvia
Lee Hackl (argued), Sr. Asst. Atty. Gen.,
for respondent.

Before BROWN, C.J., CARDINE,
URBIGKIT and MACY, JJ., and
GUTHRIE, J., Retired.

CARDINE, Justice.

This was an action to require the state auditor to pay Wyoming county court judges the increased salary granted them by the 1985 Wyoming legislature amending and reenacting § 5–5–119, W.S.1977, which provides in pertinent part:

"Each judge of a county court shall receive an annual salary of forty-six thousand five hundred dollars ($46,500.00) effective July 1, 1985, subject to constitutional provisions concerning when the salaries can be effective, to be paid by the state. When a new salary is effective for any judge of a county court upon new appointment or the commencement of a new term, it shall be effective for all judges of the county courts."

Pursuant to § 1–13–101, W.S.1977, and Rule 52(c), W.R.C.P., the district court, upon the joint motion of the parties, reserved and sent to us for determination the following questions:

"1. Does Article 3, Section 32, Wyoming Constitution prevent increases in salaries of the County Court Judges as authorized by Chapter 218, Session Laws of Wyoming 1985 (Sec. 5–5–119 W.S.) as of July 1, 1985?

"2. If such increase is not prevented from being effective as of July 1, 1985, does Article 3, Section 35, Wyoming Constitution make ineffective a peremptory writ of mandamus directing payment of amount of past due salaries to the County Court Judges?"

In an opinion dated August 1, 1985, the Wyoming attorney general advised the state auditor that payment of the increased salary to county court judges during the term for which they were elected would be violative of Art. 3, § 32 of the Wyoming Constitution. The state auditor, relying upon the attorney general's opinion, has refused to pay increased salaries to county court judges during the term they were serving prior to the enactment of § 5–5–119, supra. Ten judges, retained in office November 1986, have, since January 1, 1987, been paid the increased salary of $46,500 per year. Nine county court judges, not up for retention, who were in

office at the time of enactment of § 5–5–119 and who are doing the same work and have the same responsibilities, are being paid $40,000 per year, or $6,500 less than the newly retained county judges.

## ARTICLE 5, § 17

The writers of the Wyoming Constitution in 1889 were determined to ensure that salaries of certain public officers should not be increased or diminished after their election or after appointment to fill a vacancy in an unexpired term. Thus, with respect to the legislative branch of government, Art. 3, § 6 of the constitution provides in part, "but no legislature shall fix its own compensation," and Art. 3, § 9 provides, "[n]o member of either house shall, during the term for which he was elected, receive any increase of salary or mileage under any law passed during that term."

With respect to the executive department, Art. 4, § 13 of the Wyoming Constitution provides that the salaries of the governor, secretary of state, state auditor, state treasurer, and superintendent of public instruction "shall not be increased or diminished during the period for which they were elected * * *." And with respect to the supreme court justices and district court judges in the judicial branch of government, Art. 5, § 17 of the Wyoming Constitution, before amendment in 1953, provided that salaries of judges of the supreme and district courts "shall not be increased or diminished during the term for which a judge shall have been elected * * *."

Article 5, § 17 of the Wyoming Constitution, prohibiting increase or decrease in salaries during a judge's term, resulted in extreme unfairness in the salaries of judges. Supreme court justices were elected to staggered terms of eight years. When the legislature granted a salary increase for the supreme court, a justice, reelected the fall preceding the legislative session, would not receive that salary increase for seven and one-half years. That was bad enough, but worse was the fact that the justice next reelected after the salary increase would receive it one and

one-half years after passage; the second justice, three and one-years after passage; and the third justice five and one-half years to seven and one-half years after passage. The situation could become even more intolerable if a justice were appointed to fill a vacancy in the office. It was possible that three justices (the court has since been increased to five), with the same responsibilities and doing the same work, were being paid substantially different salaries at the same time.

The district court judges, elected to six-year terms, suffered the same salary inequities. There were occasions when salary increases, granted to both the supreme court justices and the district court judges, became effective for some district court judges years before they became effective for supreme court justices. In these instances, district court judges were being paid greater salaries than supreme court justices. There were also occasions when judges, newly appointed to fill vacancies, were making far more in salary than experienced judges who had served long terms upon the bench. The unfairness was obvious. The same unfairness in other jurisdictions was corrected by constitutional amendment. Thus, in *Peterson v. Speakman*, 49 Ariz. 342, 66 P.2d 1023, 1026 (1937), it was stated:

"It is a well-known fact, as shown by the argument in the publicity pamphlets distributed before the election of 1930, that the reason for the amendment being submitted was the obvious injustice that several different men, holding the same office, doing similar work and coequal in authority therein should draw different salaries, and it was because, doubtless, of this injustice, that the amendment was approved by the people." See 67 C.J.S. Officers § 230 (1978).

To correct the unfairness in compensating Wyoming judges, House Joint Resolution No. 5, adopted in 1953, resulted in the amendment of Art. 5, § 17 of the Wyoming Constitution, which now provides:

"The judges of the supreme and district courts shall receive such compensation for their services as may be prescribed by law, which compensation shall not be increased or diminished during the term for which a judge shall have been elected, and the salary of a judge of the supreme or district court shall be as may be prescribed by law; provided, however, *that when any legislative increase or decrease in the salary of the justices or judges of such courts whose respective terms of office do not expire at the same time, has* heretofore or shall hereafter *become effective as to any member* of such court, *it shall be effective from such date as to each of the members thereof.*" (Emphasis added.)

■ The same inequities that existed among supreme court justices and district court judges before amendment of Art. 5, § 17 in 1953 exist now among county court judges. It has been suggested that amended Art. 5, § 17 of the constitution was intended to apply to all state court judges elected to staggered terms. If there had been a county court or if anyone had foreseen this new tier of courts in 1953 when the amended Art. 5, § 17 was adopted, it is reasonable to assume that county courts would have been included. But county courts were not included, nor was there a general clause providing for inclusion of "such other courts as the legislature might designate." Amended Art. 5, § 17 makes reference only to "supreme and district courts." When reference is made to "such court" in amended Art. 5, § 17, it is a reference back to "supreme and district courts." The words "supreme and district courts" in Art. 5, § 17 are clear, plain, and unambiguous. A clear, understandable provision in a constitution that is free of ambiguity must be accepted by the court. *Rasmussen v. Baker*, 7 Wyo. 117, 50 P. 819 (1897). In such case, construction is not permissible, nor may the court interpolate or add to the constitution what it concludes should have been there. *United States v. Sprague*, 282 U.S. 716, 51 S.Ct. 220, 75 L.Ed. 640, 71 A.L.R. 1381 (1931). The same rules apply to the construction of provisions of the constitution as apply to the construction of statutes. *Zancanelli v. Central Coal & Coke Company*, 25 Wyo. 511, 173 P. 981, 991 (1918). Thus, when a

constitutional provision is unambiguous, courts are not at liberty to undertake its construction nor search for a meaning beyond the instrument itself. *Clark v. City of Tucson*, 1 Ariz.App. 431, 403 P.2d 936, 938 (1965). We cannot in good conscience interpret "supreme and district courts" to include county courts, nor can we add county courts to Art. 5, § 17. If that is to be done, it must be by constitutional amendment, not court decision.

## ARTICLE 3, § 32

Because increase or decrease in county court judges salaries is not mentioned in Art. 5, which establishes the judicial branch, nor governed by Art. 5, § 17, it is claimed that their salaries are governed by Art. 3, § 32 of the Wyoming Constitution, which provides as follows:

> "Except as otherwise provided in this constitution, no law shall extend the *term* of any *public officer* or increase or diminish his salary or emolument after his *election or appointment * * *.*"
> (Emphasis added.)

Article 3, § 32 applies only to a *public officer* having a specific *term* of office to which he is *elected or appointed*.

### Public Officer

Article 3, § 32, though found in the part of the constitution pertaining to the legislative branch, is of a general character and intended to apply also to public officers in the executive and judicial branches. Thus, speaking of a county attorney, a part of the executive branch, we said:

> "The meaning of this section is clear. There is no ambiguity about it. The words are pointed and direct. They mean just what they say, and construe themselves. When it says that the salary of a public officer shall *not be increased or diminished after his election*, it means that the salary or compensation for the *term to which he was elected* shall not be changed after, but becomes fixed as of the date of *the election * * *.*" (Emphasis added.) *Nickerson v. Winslow*, 22 Wyo. 259, 138 P. 184, 186 (1914).

In *Ballantyne v. Bower*, 17 Wyo. 356, 99 P. 869, 871 (1909), the court, considering the nature of the office of justice of the peace, stated:

> "[T]he words 'civil office under the state' import an office in which is reposed some portion of the sovereign power of the state, and, of necessity, having some connection with the 'legislative, judicial, or executive department of the government' * * *. '[A]ll officers whose duties are prescribed by general law, however trivial, perform their own particular portion of the business of the state.' "

The county judge occupies a public office. This broad definition of public officer might also include public service commissioners (appointment and removal pursuant to §§ 37–2–101 and 28–12–101, W.S.1977), attorney general (§§ 9–1–601 and 9–1–202, W.S.1977), chief executive officer, livestock board (§ 11–18–101, W.S.1977), director, employment security commission (§ 27–3–601, W.S.1977), director, game and fish commission (§ 23–1–201, W.S.1977), state examiner (§§ 9–1–501 and 9–1–202, W.S. 1977), state entomologist (§ 11–4–101, W.S. 1977), state engineer (Art. 8, § 5, Wyoming Constitution), state chemist (§ 35–7–201, W.S.1977), state librarian (§ 9–2–417, W.S. 1977), director, state archives (§ 9–2–404, W.S.1977), director, recreation commission (§ 36–4–101, W.S.1977), state board of equalization (§ 39–1–302), commissioner of public lands (§ 36–3–101), and others.

### Definite Term Required

Public officer was further described in *Blackburn v. Board of County Commissioners*, 67 Wyo. 494, 226 P.2d 784, 789 (1951), as an office with a definite term and duties. We said:

> "Where the duties of the office are to be exercised for the benefit of the public for a stipulated compensation to be paid by the public, *where the term is definite and the tenure certain, and where the powers, duties, and emoluments become vested in a successor when the office becomes vacant*, it can confidently be affirmed that the occupant of the place is a public officer within the meaning of the Constitution." (Emphasis added.)

Blackburn, supra, and Art. 3, § 32 require that the office be for a *definite term with tenure.* Of the public officers listed above, only the public service commissioners, director of employment security commission, state engineer, commissioner of public lands, and members of the state board of equalization are appointed to a definite term with tenure. The public service commissioners, state engineer, commissioner of public lands, and members of the state board of equalization are appointed by the governor. The director of the employment security commission is appointed by the commission. All are appointed to definite terms and have certain tenure, for they generally may be removed only for cause. All executive branch personnel "except for the positions of Governor, Secretary of State, State Auditor, State Treasurer, Superintendent of Public Instruction, District Attorney, and positions within the University of Wyoming," Ch. IX § 1, Personnel Rules, are covered by the personnel rules, providing for classification, allocation of positions, pay ranges, and merit increases. All receive salaries set by the personnel department of the executive branch of government. It has been the practice of the executive branch to raise the salaries of these appointed public officials during their term. These appointed public officers have never been considered as within the prohibition in Art. 3, § 32 against increasing salaries during their term, although they, like county court judges, are *appointed* to a *public office* having a definite *term.*

*Elective or Appointive Public Office*

It is also required by Art. 3, § 32 that the public officer, whose compensation may not be increased or diminished, occupy a *public office* by *election* or *appointment.* The question now presented for our determination is whether the public office referred to is only an elective office or whether it also includes nonelective offices. The question is one of first impression for this court. Every case heretofore presented to us involved a public officer occupying an elective office or appointed to fill a vacancy in an elective public office. *Barber v. Board of County Commissioners of Uinta*

*County,* 73 Wyo. 222, 277 P.2d 977 (1954); *Blackburn v. Board of County Commissioners of Park County,* supra 226 P.2d 784; *Ballangee v. Board of County Commissioners of Fremont County,* 66 Wyo. 390, 212 P.2d 71 (1949); *Nickerson v. Winslow,* supra 138 P. 184; *Guthrie v. Board of Commissioners of Converse County,* 7 Wyo. 95, 50 P. 229 (1897); *Board of Commissioners of Converse County v. Burns,* 3 Wyo. 691, 30 P. 415 (1892). If public office includes also appointment to a nonelective office, then the public service commissioners, employment security commission director, game and fish commission director, state highway department director, state engineer, commissioner of public lands, members of the state board of equalization and others may be barred from receiving an increase in compensation during their respective terms. If, however, appointment refers to appointment to an elective office that becomes vacant, Art. 3, § 32 would affect none of the above public officers who are appointed to nonelective offices. The meaning of appointment of a public officer to public office in Art. 3, § 32 is ambiguous and unclear, requiring that we ascertain the intent of those adopting the amendment and the meaning to be attributed to the words used.

In construing the constitution, the chief and fundamental purpose is to determine and give effect to the intention of the framers. *Thomson v. Wyoming In–Stream Flow Committee,* Wyo., 651 P.2d 778 (1982); *Witzenburger v. State ex rel. Wyoming Community Development Authority,* Wyo., 575 P.2d 1100, reh. denied 577 P.2d 1386 (1978); *Zancanelli v. Central Coal & Coke Company,* supra 173 P. 981; *Rasmussen v. Baker,* supra 50 P. 819. Every statement in the constitution must be interpreted in light of the entire document. *Bower v. Big Horn Canal Association,* 77 Wyo. 80, 307 P.2d 593 (1957). The constitution should not be interpreted to render any portion of it meaningless, with all portions of it to be read in pari materia and every word, clause, and sentence considered so no part will be inoperative or superfluous. *Reliance Insurance Company v. Chevron*

*U.S.A. Inc.,* Wyo., 713 P.2d 766 (1986); *Hamlin v. Transcon Lines,* Wyo., 701 P.2d 1139 (1985); *Haddenham v. City of Laramie,* Wyo., 648 P.2d 551 (1982). Where a provision in a constitution creates a restriction or limitation as upon compensation of public officials and its intended extent is uncertain, the purpose should mark the limit of the provision. *Ballengee v. Board of County Commissioners of Fremont County,* supra 212 P.2d 71.

The policy reasons for providing that the salaries of public officers may not be increased or decreased during their term are to protect the public officer against legislative threats, reprisals or punishment by threatening to decrease his salary or seeking to influence a public officer to act in a certain way by promising an increase in salary. The prohibition is said also to protect the legislature against pressures that might be asserted by public officers seeking increases in salary after election. *Blackburn v. Board of County Commissioners of Park County,* supra 226 P.2d 784; *Ballangee v. Board of County Commissioners of Fremont County,* supra 212 P.2d 71.

> "Limitations of this type are designed to establish the complete independence of the officers affected by them, and to *protect* them *against legislative oppression which might flow from party rancor,* personal spleen, enmity, or grudge." 63A Am.Jur.2d Public Officers and Employees § 444 at 993 (1984).

If there is a place where there is power that can be used to cause a public official in one branch of government or the other to act in a certain way upon threat of granting or withholding money, it is the political sector. Those occupying elective office face no more important task than that of reelection, for, in the absence of reelection, they hold no public office. Public image created by perception, competence, ability to accomplish things for constituents and acceptance in the political power structure are of paramount importance. Most often those at the top of the political structure are those elected to political public office. Thus, the five elected public officials—the governor, treasurer, auditor, secretary of state, and superintendent of public instruction—are usually acknowledged as leaders in or the head of their respective parties. They have a broad constituency and have close ties with political leaders over the entire state. Their endorsement, approval or support is a considerable benefit to one seeking election. The granting or withholding of an endorsement might involve considerable pressure to accede to requests by the head of the party. And there are elected legislators and elected county officers who, because of long tenure, competence and ability, and their considerable involvement in the political process, exercise this same kind of power.

> "These restrictions are designed to protect the public against the evil of permitting a public official to use his official power and prestige to augment his own salary * * *.
>
> "Furthermore, the restrictions are designed to benefit the officers by removing temptation from the legislature to influence a public officer through threat or promise of a change in compensation * * *." 67 C.J.S. Officers § 231 (1978).

██ It cannot be seriously said that county judges can bring pressure to increase their salaries. They have no constituency, no political party; they are a small isolated group. They must decide controversies in which someone always loses. They cannot always be popular. They have no choice but to apply the law as it exists. Those who witnessed the effort to raise county judges' salaries to at least the amount paid district attorneys who appear in their court can attest that they can bring no pressure upon anyone to raise their salaries. Judges historically have been unable to obtain even cost-of-living increases in their salaries granted all other state employees. So, where is the power and the danger of a raid on the public treasury? Judges are a small group having few votes and little support. They are easily and often popularly denied salary adjustments given to all others. With respect to the possibility of the legislature influencing county judges by increasing or decreasing

their salaries, that potential is more fiction than fact. The judges' decisions are subject to review by two appellate courts. They are not the final arbiter of the constitutionality of legislative or executive action, nor construction of provisions of the constitution or statutes. The county courts are not of constitutional origin, but were created by statute and can be eliminated at any time by repeal or amendment of the statute. If they are subject to a decrease in salary, that is no different than many other non-constitutional public officers appointed to a definite term. We conclude, therefore, that it is only public officers in elective public office and public officers appointed to fill vacancies in elective public offices that are prohibited by Art. 3, § 32 from receiving an increase or decrease in salary during their term.

■ Having determined that Art. 3, § 32 applies only to elective office, the final question we must resolve is whether the county judge is an elected public official holding elective office. The primary meaning of the word election as used in Art. 3, § 32 is the act of selection or choosing a public officer from among several candidates for the public office by qualified voters of a community, political subdivision or state. *In re Advisory Opinion to the Governor,* Fla., 116 So.2d 425 (1959); Am. Jur.2d Elections § 1 (1966). Before amendment of Art. 5, § 4, judges were elected under § 2540, W.S.1920, which provided:

"[T]he county clerk or other official * * * shall prepare a separate ballot similar and substantially in the same general form and the names rotated on said ballot as hereinbefore provided for in §§ 2536 to 2540 for the nomination of judicial officers at the primary election; and the two candidates receiving the highest number of votes at the primary election shall be entitled to have their names printed on the official ballot at the general election. The candidate receiving the highest number of votes at said general election shall be declared duly elected to the office for which said person was a candidate." See also § 22–111, W.S.1957.

An elective office for purposes of this discussion is one for which voters choose between competing candidates at a general election.

From 1889 until 1971 the Wyoming court system consisted of the supreme court at the appellate level; district courts, which were courts of general jurisdiction, at the trial level; and justice of the peace courts. During that time, all judicial officers were elected, i.e., each candidate for judgeship filed for the office, ran in a primary election, and then in the general election against an opponent seeking the same office. Sections 31–108 and 31–109, C.S.1945; Art. 5, § 4, Wyoming Constitution.

Amended Art. 5, § 4 of the Wyoming Constitution was adopted in 1971 at a time when there were no county courts. It, therefore, was made applicable to the courts then existing, i.e., the supreme court and district courts. It provides initially for the appointment of justices of the supreme court and judges of the district court by the governor from a list of three nominees provided by the Judicial Nominating Commission and then provides:

"(g) Each justice or judge selected under these provisions shall serve for one year after his *appointment* and until the first Monday in January following the next general election after the expiration of such year. He shall, at such general election, *stand for retention* in office on a ballot which shall submit to the appropriate electorate the question whether such justice or judge shall be retained in office for another term or part of a term * * *." (Emphasis added.)

The amendment of the constitution to provide for the selection and retention of judges was intended to depoliticize the judiciary. Canon 7 of the Code of Judicial Conduct provides in part:

"(1) A judge or a candidate for election to judicial office should not:

"(a) Act as a leader or hold any office in a political organization;

"(b) Make speeches for a political organization or candidate or publicly endorse a candidate for public office;

"(c) Solicit funds for or pay an assessment or make a contribution to a political organization or candidate, attend political gatherings, or purchase tickets for political party dinners, or other functions, except as authorized in subsection A(2)."

In states where judges attain office by contested election, as in the state of Texas, it is a matter of record that lawyers contribute large sums ($20,000–$35,000) to the election of judges before whom they appear and present their cases. That system of judicial election in Texas was the subject of considerable adverse comment in national publications discussing *Pennzoil Company v. Texaco, Inc.*, — U.S. —, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987).

Wyoming judges, however, do not belong to political parties, may not contribute to political parties or candidates, and may be involved in the political process in only a limited way. Not having an opponent in a contested election, judges need not raise campaign funds or conduct political campaigns or expend large sums of money in advertising and getting elected. Not having to solicit campaign funds, they do not become obligated to contributors, supporters, and campaign workers. The judiciary is freed from potential conflict of interest problems, obligations to political organizations, and pressures resulting from the business of a contested election and the world of politics.

In 1971, the legislature established county courts by enactment of §§ 5–5–101 through 5–5–175, W.S.1977. Initially, county court judges stood for election against an opponent seeking the same office. Vacancies in office were filled by the county commissioners from three nominees supplied by the district court judge. Sections 5–5–113 and 5–5–115. In 1978, §§ 5–5–110 and 5–5–111, W.S.1977, were amended to provide that county judges be *appointed* and *retained* under the provisions of Art. 5, § 4 of the Wyoming Constitution in the same manner as supreme court and district court judges. Thus, county judges now always first take office by appointment by the governor. They never stand for *election*, but only for *retention*. An elector never votes for a county judge or his opponent, but votes only upon the question, "shall the county judge be retained." The county judge, therefore, is not an elected public official as that term is used in Art. 3, § 32.

A constitution is not lifeless, but is a flexible, living document intended to accommodate new conditions and circumstances in a changing society, *State v. McAdams*, Wyo., 714 P.2d 1236 (1986), to promote convenience and ensure only that which is reasonable, logical and just. *State ex rel. Department of Revenue and Taxation, Motor Vehicle Division v. McNeese*, Wyo., 718 P.2d 38 (1986). With the amendment of the constitution, changes in statutes, and appointment rather than election of county judges, there is no longer a valid reason for prohibiting an increase in salary during the judges' terms.

Since the judge is not a member of a political party, not involved in party functions and business, and is prohibited from contributing to the party or candidate, it hardly seems that party officials could be angry or want to vent their spleen against him because of party politics. For the legal and policy reasons stated, we conclude that the county judge is not an elected public official, nor is he appointed to an elective public office; therefore he is not prevented by Art. 3, § 32 of the Wyoming Constitution from receiving the salary increase granted by the enactment of § 5–5–119, W.S.1977.

Our conclusion finds support also in the fact that neither the executive nor legislative branches have considered Art. 3, § 32 to apply to public officers serving as public service commissioners, director of employment security commission, state engineer, commissioner of public lands, and members of the state board of equalization to prohibit salary increase or decrease during their terms. These *public officers appointed* to a *definite term* receive salary increases during their terms. These appointed public officials have no real constituency; and, although some may be somewhat political, they have no power that does not come from the appointing official. While not

determinative of the question of the proper construction of Art. 3, § 32, we do consider the interpretations placed thereon by other branches of government as some evidence of what is reasonable.

### APPROPRIATION OF FUNDS

■ The State next contends that a peremptory writ of mandamus directing payment of past-due salaries would be ineffective because the legislature failed to appropriate funds for payment of these salaries as required by Art. 3, § 35 of the Wyoming Constitution. Article 3, § 35 provides:

"Except for interest on public debt, money shall be paid out of the treasury only on appropriations made by the legislature, and in no case otherwise than upon warrant drawn by the proper officer in pursuance of law."

The legislature enacted § 5-5-119, W.S. 1977, providing salaries to be paid county judges subject only to "constitutional provisions concerning when salaries can be effective." We have held county judges are neither elected nor appointed to a vacant elective office and that the constitution does not prevent their salaries becoming effective during their terms. In *State ex rel. Henderson v. Burdick*, 4 Wyo. 272, 33 P. 125 (1893), the legislature provided an annual salary of $2,000 for the state examiner but neglected an appropriation of funds to pay the salary of the examiner. The office of state examiner is a constitutionally created office. We held in *Blackburn v. Board of County Commissioners*, supra 226 P.2d 784, that constitutional provisions concerning salaries applied in the same manner to constitutional public offices and those created by the legislature. We stated in *Burdick*, supra 33 P. at 127–131:

"If the constitution had fixed the salary, and the time and manner of payment, there would have been no doubt, under the great weight of authority, that this would have been an appropriation made by 'law,' * * *."

"Although some courts seem to distinguish between salaries fixed by the constitution and those fixed by an unre-pealed statute, it seems that this is a distinction more nice than wise. In either case, the people have given their assent * * *."

"No specific appropriation was made otherwise than by this act, and none was necessary * * *."

"The act before us is in effect and operation an appropriation act, and it stands unrepealed and unmodified. It provides for the compensation of a public officer, and requires the treasurer to pay it. It does not require any other legislation, or a special appropriation at each biennial and regular session of the legislature, to keep it alive and effective."

"The direction to the treasurer to pay the amount of the annual salary of the examiner to that officer may be held by implication to be an appropriation of a sufficient amount of money to make the required payments. *Campbell v. Board, etc.*, 115 Ind. 594, 18 N.E.Rep. 33. The fund set apart and allotted to this purpose is the general fund of the state provided from the general revenue."

And, quoting with approval from *Reynolds v. Taylor*, 43 Ala. 420, 430 (1869), we said "that, in order to authorize the comptroller to issue his warrant on the treasury for the amount of the salary, it was not necessary that there should be a special annual appropriation by act of the legislature, where there was a general law fixing the amount of the salary, and prescribing its payment at particular periods; and the court observed: 'We are not aware that this decision has been doubted from that day to the present time.' It has been no unusual thing for a legislature to adjourn without making appropriations for the salaries of state officials, or some of them, either through intention or mistake." *State v. Burdick*, supra 33 P. at 129.

The act establishing salaries of county court judges, § 5-5-119, supra, was effective to appropriate funds for payment.

### EFFECTIVE DATE

■ Section 5-5-119, W.S.1977, also provided that the increased salaries would be

effective July 1, 1985, "subject to constitutional provisions concerning when the salaries can be effective." We have held that there is no constitutional provision concerning when county court judges' salaries become effective. According to § 5–5–119, supra, the effective date for county judges' salaries was July 1, 1985, and the state auditor should have paid them. He did not. The appellant did nothing until May 26, 1987, almost two years later, when this action seeking mandamus was filed. Although mandamus is a legal remedy, its issuance is controlled by equitable principles. It is said that

"[a] writ of mandamus, as we have above pointed out, is not awarded as a matter of right, but on equitable principles. An application for the writ should be made seasonably and within a reasonable time after the alleged default or neglect of duty." *Buell v. County Court of Jefferson County,* 175 Or. 402, 152 P.2d 578, 582, 155 A.L.R. 1135 (1944).

We were given no reason for the year and eleven month delay in pursuing this writ. We assume there is none. The increased salaries, therefore, must be paid to the county court judges not now receiving them commencing May 26, 1987, the date petitioners filed suit to require such payments.

The peremptory writ is allowed in accordance with this opinion.

URBIGKIT, J., filed a specially concurring opinion.

MACY, J., filed a dissenting opinion in which GUTHRIE, J., Retired, joined.

GUTHRIE, J., Retired, filed a dissenting opinion.

URBIGKIT, Justice, specially concurring.

Although not necessarily adopting the rationale of the court in granting the relief requested in this appeal nor denying the logic of the dissents, I join the majority by this special concurrence from a different persuasion, based on the historical developments of the judicial article within the Wyoming Constitution. This history, provided in 1890 by Art. 5, Judicial Department, established in § 1 that:

"The judicial power of the state shall be vested in the senate, sitting as a court of impeachment, in a supreme court, district courts, justices of the peace, courts of arbitration and such courts as the legislature may, by general law, establish for incorporated cities or incorporated towns."

As was then considered and now noted both in this court's opinion and in dissents, the Constitution also, as encompassing the salary-change limitations of both Art. 5, § 17 and Art. 3, § 32 when applied to the extended terms provided for the judiciary, had created an anomaly of differentiated salaries dependent upon date of election of members. This recognized unfairness led the legislature to present, and the electorate to ratify, a constitutional change of that section in 1953 by the equality salary provision now provided in Art. 5, § 17:

" * * * provided, however, that when any legislative increase or decrease in the salary of justices or judges of such courts whose respective terms of office do not expire at the same time, has heretofore or shall hereafter become effective as to any member of such court, it shall be effective from such date as to each of the members thereof."

In the decade that followed, a broad-based reaction, under the sponsorship of the Wyoming State Bar and the League of Women Voters, to the constitutionalized justice of the peace courts matured to legislative presentation and electorate adoption of the 1965 constitutional amendment effective January 17, 1967, which changed the Wyoming judicial structure as now provided in Art. 5, § 1:

"The judicial power of the state shall be vested in the senate, sitting as a court of impeachment, in a supreme court, district courts, and such subordinate courts as the legislature may, by general law, establish and ordain from time to time."

Although the electorate had progressively spoken by adoption of the constitutional amendment, any replacement system as a substitute for the part-time justice of the

peace as the first general level of adjudication was buffeted in change to the county court system by local provincialism and operational costs then, and continued to date, by an extremely difficult birth and maturity process.

County courts were originally established in only two counties, Laramie and Natrona, by Ch. 261, S.L. of Wyoming 1971. The law was first legislatively tailored so that county judges could only be available in those two counties, with an effective date of January 1, 1975, to be selected by popular election in the fashion of the superseded justices of the peace. Heavy and continued modernization demands from progressive elements of the Wyoming justice-delivery system, accommodated by action of the legislature, not only expanded very substantially the availability of the county courts, but also invoked Art. 5, § 4(b) of the Constitution to effect a modified Missouri-plan method of selection and retention by Ch. 45, S.L. of Wyoming 1978, § 5–5–111, W.S.1977, 1987 Cum.Supp. With selection and retention addressed for those judges in identical fashion as was required for the other full-time judges and justices of the state, the jurisdiction of the county courts was also expanded to encompass a significant area of the adjudicative function formally reserved to the district courts in earlier time when only the predecessor justice of the peace courts had existed.

In 1971, when the law was enacted to be effective in 1975, the legislature provided that the county court would have jurisdiction *concurrently with district courts* in a general civil case level of $1,000, criminal jurisdiction of misdemeanors, and a provision for preliminary hearings of felony offenses. In succeeding legislation, in addition to similarity by selection pursuant to the provisions of Art. 5, § 4 of the Constitution, the county courts were given exclusive jurisdiction for all actions in an amount not exceeding $7,000, and more specific criminal authority, including adjudication of high misdemeanors for all nonfelony offenses. Further provision was made to constitute the district court as an intermediate appellate court for appeal

from decisions of the county court, both criminal and civil. With the enactment of this exclusive jurisdiction by elimination of concurrent jurisdiction, combined with the nonpartisan selection and retention process, it is apparent that the functioning county court embraced not only an area of responsibility previously exercised by the justice of the peace courts, but also a singular arena of adjudicatory jurisdiction which had previously been vested solely in the district court.

My consideration of the applicability of Art. 5, § 1 to the earlier existent Art. 5, § 17 affords no logical basis to continue a discrimination against a class of full-time judges solely on the basis of its nomenclature, without regard for the intrinsic nature of the judicial function involved. *Peterson v. Speakman,* 49 Ariz. 342, 66 P.2d 1023 (1937). In practical application, this court considers whether the constraining general language of Art. 3, § 32 applies a continued salary limitation to the judicial article after adoption of the equalization amendment for types of courts not then in existence. I reject that result as did the legislature in the enacted salary bill which is here in question.

It is apparent that in enacting the salary increase by Ch. 218, S.L. of Wyoming 1985, the legislature intended an effective date as soon as constitutionally possible and rejected salary discrimination if, within their power, avoidance could be achieved.

"When a new salary is effective *for any judge* of a county court upon new appointment or the commencement of a new term, *it shall be effective for all judges of the county courts.*" (Emphasis added.)

The further language, "subject to constitutional provisions concerning when the salaries can be effective, to be paid by the state," was obviously intended to deter the increase from the effective date of July 1, 1985 until the effectuation process of Art. 5, § 17 of the Constitution could be applied. From the specific language used in the salary-increase law, it is apparent that the legislature then intended, as I now conclude, that the appointment or retention-

election of a new county judge would provide the constitutional basis for all judges to similarly and simultaneously receive the increased compensation. It is in this regard that I may differ with both the majority and the dissents, because each separately, although for totally different reasons, seems, in effect, to hold that the specific provision of the salary-increase statute is constitutionally invalid by a rejection of the simultaneous effective date for *all* judges of the county courts as effective upon the commencement of a term for any one of the members.

Likewise apparent for the denial of enacted salary benefit is the absence of any basis for differentiation premised on function or responsibility, since the denial determination is only justified by application of the title applied to the separate classes of judicial officers. If, for example, in creating this people's court trial system, as both a substitute for the justices of peace and a portion of the function of the district court the name of the class of judges had been entitled as district judges category B, the constructional question would have been eliminated. Likewise, if the present county courts had been named district courts, and the district courts renamed superior courts, little question would exist that the application of the salary equalized provision to all members of each of these levels of the judiciary would result.

I relate the Constitution in interest and effect to the functional nature of the justice-delivery system. Obviously, county courts, circuit courts, trial courts, or any other designated categorization, could not have been included at the passage of the constitutional amendment to Art. 5, § 17, since at that time the kinds of courts were constitutionally limited to "supreme courts, district courts, justices of the peace, courts of arbitration" and municipal courts. I would find intent in the expansion of the section to retain its ameliorative effect for similar functional systems. Obviously, if someone in authority had been able to think all of this out, the more specific terminology might have been included, as it was in the subsequently adopted Art. 5, § 4(b), to provide equivalency of status to the developing county court system after constitutional authorization for establishment of the alternate class of courts had been achieved by the 1967 amendment.[1]

Furthermore, it has to be noted, if one relates to historical perspective, that in current time with passage of the minimum jurisdiction amounts for the county courts, and in provisions for certiorari provided by § 5–2–119, W.S.1977, and Rule 13, W.R. A.P., the historical function of the supreme court, as envisioned by the monumental debate in the constitutional convention, has been significantly changed by the application to the district courts of an appellate function not then contemplated.[2] Likewise

1. In 1890, Art. 3, § 32 of the Constitution provided in relevant part:

    "Except as otherwise provided in this constitution, no law shall extend the term of any public officer or increase or diminish his salary or emolument after his election or appointment * * *."

    Article 5, § 17 provided:

    "The judges of the supreme and district courts shall receive such compensation for their services as may be prescribed by law, which compensation shall not be increased or diminished during the term for which a judge shall have been elected, and the salary of a judge of the supreme or district court shall be as may be prescribed by law."

    By the 1953 amendment, Art. 3, § 32 was unchanged, and Art. 5, § 17 was restated:

    "The judges of the supreme and district courts shall receive such compensation for their services as may be prescribed by law, which compensation shall not be increased or dimin-

    ished during the term for which a judge shall have been elected, and the salary of a judge of the supreme or district court shall be as may be prescribed by law; provided, however, that when any legislative increase or decrease in the salary of the justices or judges of such courts whose respective terms of office do not expire at the same time, has heretofore or shall hereafter become effective as to any member of such court, it shall be effective from such date as to each of the members thereof."

2. One of the major debates of the 1889 Wyoming constitutional convention, as raised in three separate sequences, was whether or not there should be a supreme court at all, or whether the constituency of the district bench should en banc constitute the appellate tribunal. After extended and continued debate, the independent supreme court was only approved by the rather minimal vote in the convention of 21

to be considered is that in 1966 the civil jurisdiction of the justice of the peace court was $200 (concurrent jurisdiction in the district court above $100), and criminal jurisdiction then as now excluded high misdemeanors. The county courts today embrace more than half the case responsibility in high misdemeanors and the $7,000 exclusive jurisdiction which once was embodied by assignment to the district court.

My conclusion on this issue of constitutional salary interpretation denies determination by a name unrelated to function and essential characteristics. Logic also tells me that I do no harm to the concept of the public employee salary limitation which serves as a severe and well-founded question in dissent. Cf. *Blackburn v. Board of County Commissioners of Park County*, 67 Wyo. 494, 226 P.2d 784 (1951); *Ballangee v. Board of County Commissioners of Fremont County*, 66 Wyo. 390, 212 P.2d 71 (1949); *Reals v. Smith*, 8 Wyo. 159, 56 P. 690 (1899).

In this analysis, I apply a rational interpretation in constitutional analysis consistent with an evolving society. The comparison may seem in part to be mundane, but I see no difference in the attitude and application afforded by the premier jurist in the history of the state of Wyoming, Fred H. Blume, where in *Chicago & Northwestern Railway Co. v. Hall*, 46 Wyo. 380, 26 P.2d 1071, 1073 (1933), the court was called to determine the status of railroad tie-preserving plants in a constitutional context for taxation as something that was not in existence when the Constitution had been written:

" * * * [I]t is apparently argued by counsel for defendant that tie-preserving plants were not in use in 1889; that they were not in the contemplation of the framers of the Constitution or of the people; and that they cannot, accordingly, be considered as embraced in, or contemplated by, the section of the Constitution now under consideration. This contention, we think, is too broad. The section is a part of our organic law. The Constitution is, in a sense, a living thing, designed to meet the needs of a progressive society, amid all the detailed changes to which such society is subject. * * * Hence, though tie-preserving plants were not in existence at the time of the adoption of the Constitution, still, if it can be said that the language used in the section under consideration, naturally construed, may fairly be said to embrace them, we would not be justified in excluding them therefrom merely for the reason that they were not in existence at the time of the adoption of the Constitution."

I find in the fact that county courts did not exist and could not have existed at the time of the passage of the ameliorative constitutional equalization provision, that, fairly contemplated, all courts of a similar kind with a function and operation as then not identified could not be expected at a future time to fall beyond the remedies then intended. Following the constitutional amendment which was adopted to permit the establishment of the county courts, I now deny requirement of another constitutional amendment to afford to these newly established and constitutionally permitted elements of the judiciary the same standard of equalized compensation for similar responsibility. On a similar subject of equality of voting, see *Schaefer v. Thomson*, 240 F.Supp. 247 (D.Wyo.1964).

It is recognized that it may seem somewhat constrained to compare a new kind of industry in constitutional terms with the adaptation of a third system of courts, but this causes me no difficulty in concurrence and recognition of the impreciseness of legislative capacity to exactly identify the future and my recognition of function over name or formalism as the test of effectuated definition and responsibility.

to 17 in the late stages of the composition process of the present Wyoming Constitution. See Journals and Debates of the Constitutional Convention of the State of Wyoming, pp. 330–338, 478–495, 514–533 (1893). Now, for the first time, a total automatic right of direct appeal to the Wyoming Supreme Court in every case no longer exists, since as to municipal, justice of the peace, and county courts, the district courts serve as the intermediate courts of appeal.

This utilization of the living Constitution policy standard enunciated by Justice Blume many years before the current colloquy initiated by politically inspired revisionism as a philosophy of the law in no regard lessens the appropriate precedent and teaching of those early jurists of this state.[3] In *Grand Island & Northern Wyoming Railroad Co. v. Baker*, 6 Wyo. 369, 45 P. 494, 496 (1896), Justice Potter, who was a member of the constitutional convention, re-emphasized:

"* * * If the people of the commonwealth, by adopting a constitution, have committed themselves to a mistaken policy, the only remedy is an amendment by constitutional methods, of that instrument. Within the province of the legislature, recourse must be had to that body for the correction of any errors of policy which may have induced its enactments. The jurisdiction of the courts extends only to the construction and enforcement of the constitution and laws as they exist. That jurisdiction should be zealously guarded, but not used as a cloak to encroach upon the functions of the other departments of government."

I would not find this rule, nor the Blume philosophy, to singularly differ from the pronouncements in *Rasmussen v. Baker*, 7 Wyo. 117, 50 P. 819, 822 (1897):

"So, the language of the constitution is to be understood in the sense in which it was used at the time when it was adopted."

Seventy years ago, this court in an extended constitutional review summarized:

"The general principles governing the construction of statutes apply to the construction of constitutions. 12 C.J. 699. And the fundamental purpose in such construction is to ascertain the intent of the framers and the people who adopted

it, and give effect thereto. 12 C.J. 700. And an amendment will prevail over a provision of the original Constitution inconsistent with the amendment. 12 C.J. 709. The amendment, being the latest expression of the will of the people, cannot be limited or controlled by previous existing provisions of the Constitution. In construing the amendment the court should keep in view the Constitution as it was before it was amended, the evil to be remedied, and the terms of the amendment. *Ferrell v. Keel*, 105 Ark. 380, 151 S.W. 269.

" 'The safe way is to read its language in connection with the known condition of affairs out of which the occasion for its adoption may have arisen, and then to construe it, if there be therein any doubtful expressions, in a way, so far as is reasonably possible, to forward the known purpose or object for which the amendment was adopted. * * *' *Maxwell v. Dow*, 176 U.S. 581, 602, 20 Sup.Ct. 448, 494, 44 L.Ed. 597." *Zancanelli v. Central Coal & Coke Co.*, 25 Wyo. 511, 173 P. 981, 991 (1918).

This conclusion does no ill justice to the intent of the 1953 legislature when, by passage of House Joint Resolution No. 5, the endorsed statement was adopted for electorate vote and with that success to be now applied:

"This proposed amendment to the Constitution to the State of Wyoming allows the Legislature by law to fix during their terms the salaries of Justices and Judges of the Supreme Court and the District Courts, so that each justice and each judge performing similar duties will receive like salaries."[4]

Consequently, I believe this court will accurately apply both the intent of the con-

---

3. See among a multitude of current writing a recent article, McGraw and Crittenden, *The Role of Original Intent in Reading a Two Hundred Year Old Constitution*, 90 W.Va.L.Rev. 17 (1987).

4. In retrospect, it is interesting to note some of the membership of the legislature who voted for passage in the House by 50 votes in favor, 2 opposed, and 4 excused, including lawyers John

F. Sullivan, Robert S. "Stan" Lowe, T.C. Daniels, E. Keith Thomson, William A. Riner, Jr., William F. Swanton. Those in the Senate voting in favor included lawyers Byron Hirst, David Hitchcock, and Thomas O. Miller; the vote was not so favorable in the Senate, initially failing passage by 17 in favor, 8 opposed, and 2 excused, and then, upon reconsideration, 19 in favor, 7 opposed, and 1 excused.

stitutional amendment and the expressed desire of the legislature in determination that the pay increase was equally applicable for all judges of the county court with the commencement of the term of those newly retained in popular election by the November, 1986 vote.

Based on this history of the development of the Wyoming Constitution, I join with the court in determination that the writ should issue.[5]

MACY, Justice, dissenting, with whom GUTHRIE, Retired Justice, joins.

I dissent. The majority has succumbed to the temptation to correct what it perceives to be an extreme injustice by changing our Constitution through judicial activism.

Article 3, § 32 of the Wyoming Constitution provides in pertinent part:

"Except as otherwise provided in this constitution, no law shall extend the term of any public officer or increase or diminish his salary or emolument after his election or appointment * * *."

After quoting this section in *Nickerson v. Winslow*, 22 Wyo. 259, 268, 138 P. 184, reh. denied 140 P. 834 (1914), the Wyoming Supreme Court stated:

"The meaning of this section is clear. There is no ambiguity about it. The words are pointed and direct. They mean just what they say and construe themselves."

The majority now states:

"The meaning of appointment of a public officer to public office in Art. 3, § 32 is ambiguous and unclear, requiring that we ascertain the intent of those adopting the amendment and the meaning to be attributed to the words used." At 964.

I disagree.

The constitutional provision is clear and unambiguous. When it says that the salary of a public officer shall not be increased or decreased after his election or appointment, it means that the salary of a public officer is fixed for the term for which he was elected or appointed. A county judge occupies a public office and is a public officer. A county judge is initially appointed for a fixed term and may thereafter be retained or removed from such public office by the public at an election. Article 5, § 4(h) of the Wyoming Constitution provides in pertinent part that,

"if a majority of those voting on the question vote affirmatively, the justice or judge shall be *elected* to serve the succeeding term prescribed by law." (Emphasis added.)

Courts do not have the freedom to ignore the plain meaning of words in the Constitution so that they can search for some speculative intent. *McPherson v. Blacker*, 146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869 (1892); *City of Buffalo v. Lawley*, 6 A.D.2d 66, 175 N.Y.S.2d 547 (1958); 16 Am.Jur.2d, Constitutional Law § 111 (1979). Even though a constitutional provision may be unwise, unjust, inconvenient, harsh, or not in harmony with some public sentiment, courts are not authorized to ignore it or indirectly nullify it by analyzing it away. *State ex rel. Anderson v. Chapman*, 86 Wash.2d 189, 543 P.2d 229 (1975); 16 Am.Jur.2d, supra at § 89.

If there is a need to change the Constitution, it must be done by a vote of the people, not by judicial fiat. *Witzenburger v. State ex rel. Wyoming Community Development Authority*, Wyo., 575 P.2d 1100, reh. denied 577 P.2d 1386 (1978).

GUTHRIE, Justice, Retired, dissenting.

I wholeheartedly join in Justice Macy's dissent. It is my opinion that, if one reads the majority opinion and his dissent, it will be clear that the majority has played word games to emasculate a clear constitutional

---

**5.** In practical difference with the plurality, I would apply the constitutional limitations for any salary increase (or decrease) for judges of the county courts except as permitted by the equalization proviso of Art. 5, § 17, while the plurality decision would deny any constraining constitutional limitation. In this case it makes no difference, since I specially concur in approving the date of institution of litigation rather than the earlier date of January 5, 1987 which would have been otherwise constitutionally established.

commandment in seeking a result. In my view, this opinion demonstrates on its face that the writer is in search of a result rather than making a logical disposal under the law.

In addition to the fact that I am most disturbed by this result, it is my view that a group of county judges, in search of immediate gratification, have succeeded in achieving a classification which also removes them from the protections they should have as judicial officers. This case must logically apply to salary decreases as well as increases, along with other protections proper for judicial officers. This group may well rue the day of their apparent victory.

If for no other reason than my personal pride, I could not join in or participate in games of semantics that the majority has used to avoid the clear and obvious words of a constitutional amendment. Shakespeare may have more clearly described this opinion than is possible for me when he said:

"He draweth out the thread of his verbosity finer than the staple of his argument." Loves Labour Lost, Act 5, Scene 1.