953 P.2d 839 (1998)
The MANAGEMENT COUNCIL OF the WYOMING LEGISLATURE, and the following designated members of the Management Council in their capacities as duly-elected members of the Wyoming State Senate and State House of Representatives and as taxpayers and citizens of the State of Wyoming; Robert Grieve, Bruce Hinchey, Henry "Hank" Coe, James Twiford, Guy Cameron, Mark Harris, Tom Kinnison, Peg Shreve, Eli Bebout, Louise Ryckman and Leo Garcia, Appellants (Plaintiffs),
v.
Jim GERINGER, Governor of the State of Wyoming, Appellee (Defendant).
No. 97-307.
Supreme Court of Wyoming.
February 11, 1998.
Dan J. Pauli and David K. Gruver (argued), Legislative Service Office, Cheyenne, for Appellants.
William U. Hill, Attorney General and Michael L. Hubbard (argued), Deputy Attorney General, for Appellee.
*840 Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.
THOMAS, Justice.
The significant substantive question certified to this Court by the district court is whether the Governor has constitutional authority to veto portions of a bill which makes appropriations, but which does not make any appropriation in the portion of the bill that is vetoed. A threshold question is whether the plaintiffs in this declaratory judgment action have standing to pursue that remedy. In an effort to add focus to the standing question, this Court requested the parties to brief certain additional questions, and of its own motion raised the possibility of a violation of the separation of powers doctrine if the Court instead of the Legislature were to override the veto. We will recognize standing under the doctrine that acknowledges standing in matters of great public interest and importance, and we uphold the partial vetoes by the Governor as comporting with the clear language of the Constitution of the State of Wyoming. The first certified question is answered "Yes," and the second certified question is answered "Yes."
The certified questions the Court agreed to answer are:
1. Did the Governor have the power under Article 4, Section 9 of the Wyoming Constitution to veto portions of House Enrolled Act No. 2, enacted during the 1997 Special Session on School Finance Reform?
2. Do individual legislators or the Management Council of the Legislature have legal standing to sue the Governor regarding the exercise of his partial veto power under Article 4, Section 9 of the Wyoming Constitution?
These are stated as the issues in both the Brief of Appellants and the Brief of Appellee. No new issue is suggested in the Reply Brief of Appellants. In their Supplemental Briefs, the parties addressed the questions set forth by the Court, which were:
1. Whether WYO. STAT. § 28-8-114 (1997) constitutes a special law regulating the practice in courts of justice, in contravention of Article 3, § 27 of the Constitution of the State of Wyoming?
2. Whether Article 4, § 8 of the Constitution of the State of Wyoming provides an adequate remedy to the legislative department, making declaratory relief inappropriate?
3. Whether the judicial department is being requested, in effect, to exercise the authority of the legislative department under Article 4, § 8 of the Constitution of the State of Wyoming, and, if so, whether the action of the judicial department would infringe upon the powers reserved to the legislative department, in violation of Article 2, § 1 of the Constitution of the State of Wyoming?
4. Whether, in light of the allegations of Paragraph 17 of the Complaint for Declaratory Relief, the individual plaintiffs were disqualified from voting in this instance by the provisions of Article 3, § 46 of the Constitution of the State of Wyoming?
During a special session of the Legislature called by the Governor in 1997, the Legislature adopted House Enrolled Act 2 (HEA 2). This legislation was the response by the Legislature to the decision of this Court in Campbell County School Dist. v. State, 907 P.2d 1238 (1995). After it was signed by the appropriate officers of the legislature and its staff, it was presented to the Governor. In the enacting clause, HEA 2 states that it is an act "providing for appropriations," and multiple appropriations of moneys appear in the body of the act.[1] The Legislature adjourned promptly after its action on HEA 2 was completed, and the Governor could not return it within 3 days in accordance with the constitutional process for vetoing legislation.[2] *841 Since the Legislature, by its adjournment prevented the return of HEA 2 by the Governor in three days, he had fifteen days to return the bill to the Secretary of State with his objections. The Governor did that, and he exercised his perceived constitutional authority to veto portions of HEA 2 that did not encompass appropriations and which were substantive in nature.[3]
Article 4, Section 9 of the Constitution of the State of Wyoming encompasses the authority which the Governor exercised in his message to the Secretary of State. It provides:
The governor shall have power to disapprove of any item or items or part or parts of any bill making appropriations of money or property embracing distinct items, and the part or parts of the bill approved shall be the law, and the item or items and part or parts disapproved shall be void unless enacted in the following manner: If the legislature be in session he shall transmit to the house in which the bill originated a copy of the item or items or part or parts thereof disapproved, together with his objections thereto, and the items or parts objected to shall be separately reconsidered, and each item or part shall then take the same course as is prescribed for the passage of bills over the executive veto.
(Emphasis added). The essence of the debate in this case is captured within the emphasized language of Article 4, Section 9 of the Constitution of the State of Wyoming, with the Management Council of the Wyoming State Legislature and the associated parties (Management Council) asserting that the authority to veto is limited to appropriations only, while the Governor contends that the veto authority is much broader.
As a threshold question, we turn to the certified question relating to standing. We accept the standing of the Management Council to pursue the relief sought by way of a declaratory judgment under the doctrine of great public interest or importance. We first acknowledged the doctrine of great public interest or importance in connection with the existence of a justiciable controversy to support the invocation of the authority of the court to make a declaratory judgment. We said that the requirement of a justiciable controversy is relaxed or not followed in such instances. Brimmer v. Thomson, 521 P.2d 574 (Wyo.1974). We invoked Brimmer in our first school finance case. Washakie County School Dist. No. One v. Herschler, 606 P.2d 310 (Wyo.1980). In Memorial Hosp. of Laramie County v. Department of Revenue and Taxation of State of Wyo., 770 P.2d 223, 226 (Wyo.1989), we began to extend the doctrine of great public interest or importance from a relaxation of the requirement for a justiciable controversy to a justification for standing when we said:
Declaratory relief should be liberally administered if the elements of a justiciable controversy exist to give the trial court jurisdiction. Brimmer v. Thomson, 521 P.2d 574, 577 (Wyo.1974). For that controversy *842 to exist, a genuine right or interest must be at issue between adversarial parties, and the trial court must be able to make an effective judgment which will finally determine the rights of the parties. Id. at 578. Even these prerequisites, however, may properly be avoided or relaxed when matters of great public interest or importance are presented to the trial court. Id.; Kurpjuweit v. Northwestern Development Company, Inc., 708 P.2d 39, 44 (Wyo.1985). If the hospital could establish the existence of an actual controversy with the department, there is no doubt the trial court could effectively and finally determine that dispute. Thus, the only question remaining is whether the department has so affected an interest of the hospital so as to create an actual controversy. "Standing is a concept utilized to determine if a party is sufficiently affected to insure that a justiciable controversy is presented to the court." Washakie County School District No. 1 v. Herschler, 606 P.2d 310, 316 (Wyo.1980).
The transition became complete when we said:
We have also recognized an exception to the standing requirement when we are faced with a matter of great public interest or importance. Brimmer v. Thomson, 521 P.2d 574 (Wyo.1974). Without deciding whether Petitioners have standing to seek the issuance of a writ of mandamus which requires Governor Sullivan to implement the Wyoming Professional Review Panel Act, we hold that the issue of whether the Wyoming Professional Review Panel Act is constitutional is of great public importance and, therefore, merits a decision from this Court.
State ex rel. Wyoming Ass'n of Consulting Engineers and Land Surveyors v. Sullivan, 798 P.2d 826, 828-29 (Wyo.1990) (footnotes omitted). We hold that the issue presented in the second certified question is of great public importance that merits a decision from this Court, and we, therefore, recognize the standing of the Management Council to seek a declaratory judgment on that question.
In presenting this case, the Governor relies upon a very broad philosophy of partial veto acknowledged by the Supreme Court of Wisconsin to be vested in the governor of that state. The cases that have addressed the constitutional authority in Wisconsin are Citizens Utility Bd. v. Klauser, 194 Wis.2d 484, 534 N.W.2d 608 (Wis.1995); State ex rel. Wisconsin Senate v. Thompson, 144 Wis.2d 429, 424 N.W.2d 385 (1988); State ex rel. Kleczka v. Conta, 82 Wis.2d 679, 264 N.W.2d 539 (1978); State ex rel. Sundby v. Adamany, 71 Wis.2d 118, 237 N.W.2d 910 (1976); State ex rel. Martin v. Zimmerman, 233 Wis. 442, 289 N.W. 662 (1940); State ex rel. Finnegan v. Dammann, 220 Wis. 143, 264 N.W. 622 (1936); State ex rel. Wisconsin Telephone Co. v. Henry, 218 Wis. 302, 260 N.W. 486 (1935). The constitutional language in Wisconsin is different from the language of Article 4, Section 9 of the Wyoming Constitution, but the Governor contends that the product of the reasoning of the Wisconsin Supreme Court should be adopted in Wyoming.
The Management Council calls to our attention cases from our sister states which support the position of the Management Council that the Governor is not authorized to veto those portions of any piece of legislation that do not make an appropriation. Those cases include Harbor v. Deukmejian, 43 Cal.3d 1078, 240 Cal.Rptr. 569, 742 P.2d 1290 (1987); Colorado General Assembly v. Lamm, 704 P.2d 1371 (Colo.1985); Cenarrusa v. Andrus, 99 Idaho 404, 582 P.2d 1082 (1978); State ex rel. Teachers v. Holder, 76 Miss. 158, 23 So. 643 (1898); State ex rel. Link v. Olson, 286 N.W.2d 262 (N.D.1979); Thirteenth Guam Legislature v. Bordallo, 430 F.Supp. 405 (1977), aff'd, 588 F.2d 265 (9th.Cir.1978); and Bengzon v. Secretary of Justice of Philippine Islands, 299 U.S. 410, 57 S.Ct. 252, 81 L.Ed. 312 (U.S.Phil.Islands 1937). The Management Council relies upon State ex rel. Jamison v. Forsyth, 21 Wyo. 359, 133 P. 521 (1913), as precedent for the proposition that we will look to persuasive authority from other jurisdictions in interpreting our Wyoming Constitution. We find no fault with the decisions of the highest courts of other jurisdictions with respect to the constitutions of those states. Indeed, it is the right and therefore the obligation of any independent sovereign to interpret and *843 apply the document that defines its sovereign powers. We agree that these cases do support the position of the Management Council generally, but all of them, except for State ex rel. Link, are distinguishable because of differences in constitutional language. Further, State ex rel. Jamison is itself distinguishable from this case, and the portion of that opinion reporting on the views of other jurisdictions is dictum.
The New Mexico case of State ex rel. Sego v. Kirkpatrick, 86 N.M. 359, 524 P.2d 975 (1974) is relied upon by both the Management Council and the Governor. It supports the Governor's position with respect to the broader power to veto, but it does attach a condition to the effect that such a partial veto must only be exercised as a negative power to disapprove and cannot "distort, frustrate or defeat the legislative purpose by a veto of proper legislative conditions, restrictions, limitations or contingencies placed upon an appropriation and permit the appropriation to stand." State ex rel. Sego, 524 P.2d at 982. In North Dakota, which adopted identical constitutional language, the Supreme Court spoke in a way favorable to the Management Council in State ex rel. Link. The difficulty with that decision, however, is that the Supreme Court assumed that it was confronted with ambiguous constitutional language that required construction rather than interpretation.
Our tradition in Wyoming is different. A century ago the Court said:
The primary principle underlying an interpretation of constitutions or statutes is that the intent is the vital part, and the essence of the law. * * * Such intent, however, is that which is embodied and expressed in the statute or instrument under consideration. * * * If the language employed is plain and unambiguous, there is no room left for construction. It must be presumed that in case of a constitution the people have intended whatever has been plainly expressed. Courts are not at liberty to depart from that meaning which is plainly declared. * * * "* * * We are not at liberty to presume that the framers of the constitution, or the people who adopted it, did not understand the force of language."
Rasmussen v. Baker, 7 Wyo. 117, 50 P. 819, 821 (1897). This same rule is in vogue still. As the Court said in Campbell County School Dist., 907 P.2d at 1257:
In the case of a constitution, it must be presumed the people have intended whatever has been plainly expressed and that intent must be given effect and enforced. Rasmussen v. Baker, 7 Wyo. 117, 128, 50 P. 819, 821 (1897).
If the constitutional language is clear and unambiguous, we must accept and apply the plain meaning of that language. The same rules apply to the construction of provisions of the constitution as apply to the construction of statutes. Zancanelli v. Central Coal & Coke Co., 25 Wyo. 511, 173 P. 981, 991 (1918), followed by, County Court Judges Ass'n v. Sidi, 752 P.2d 960, 962 (Wyo.1988).
The principles articulated in Rasmussen have been followed faithfully. We are charged with discerning the intent of the Constitutional Convention, and we look first to the plain and unambiguous language to discern that intent. E.g., Griess v. Office of the Atty. Gen., Div. of Criminal Investigation, 932 P.2d 734, 737 (Wyo.1997); Newton v. State ex rel. Wyoming Workers' Compensation Div., 922 P.2d 863, 865 (Wyo.1996); Chevron U.S.A., Inc. v. State, 918 P.2d 980, 984 (Wyo.1996); Laramie County Bd. of Equalization v. Wyoming State Bd. of Equalization, 915 P.2d 1184, 1189 (Wyo. 1996); General Chemical Corp. v. Unemployment Ins. Com'n, Div. of Unemployment Ins., Dept. of Employment, 906 P.2d 380, 381 (Wyo.1995); Casper Oil Co. v. Evenson, 888 P.2d 221, 225 (Wyo.1995).
There is a degree of irony to be found in the fact that a decision relating to a school reorganization statute becomes an occasion to review principles of grammar. We do so with the wisdom of the Supreme Court of the United States in mind:
This Court naturally does not review congressional enactments as a panel of grammarians; but neither do we regard ordinary principles of English prose as irrelevant *844 to a construction of those enactments.
Flora v. United States, 362 U.S. 145, 150, 80 S.Ct. 630, 4 L.Ed.2d 623, 633, 627 (1960) (citation omitted). When addressing the plain and unambiguous meaning of Article 4, Section 9, we must look at the structure and position of the words in the constitutional provision.
According to accepted principles of grammar, the language set forth is clear and unambiguous. The participial phrase "making appropriations * * *" immediately follows and modifies "any bill." The applicable principle is addressed in JOHN M. KIERZEK & WALKER GIBSON, THE MACMILLIAN HANDBOOK OF ENGLISH, 414 (6th ed., Revised by, Robert F. Willson, Jr.1977):
Since English is not a highly inflected language (i.e., not one in which words change form to reflect grammatical relations), the meaning of an English sentence depends largely on the arrangement of the words in it. The reader naturally assumes that the parts of a sentence that are placed next to each other are logically related to each other. You must therefore be careful to arrange words in a sentence in such a way that its meaning will be clear on the first reading. The rule that will guide you may be stated in two parts: (1) place all modifiers, whether words, phrases, or clauses, as close as possible to the words they modify; (2) avoid placing these elements near other words they might be taken to modify.
See also, JUDITH NADELL ET AL., THE MACMILLAN WRITER, 655 (3rd ed.1997); JOHN C. HODGES ET AL., HARBRACE COLLEGE HANDBOOK, 248 (12th ed. rev.1994); L. SUE BAUGH, ESSENTIALS OF ENGLISH GRAMMAR, 110 (2nd ed.1993); RUTH PARLE CRAIG ET AL., 1001 PITFALLS IN ENGLISH GRAMMAR, 58-59 (3rd ed.1986). One authority states that "[n]oun modifiers have fixed positions before and after the noun." VINCENT F. HOPPER ET AL., ESSENTIALS OF ENGLISH, 89 (4th ed.1990).
Since the participial phrase, "making appropriations of money or property embracing distinct items * * *," is directly positioned after the noun "bill," the only logical, grammatical conclusion is that the participial phrase is used as an adjective modifying the word "bill." Hence, the Governor shall have the power to veto any item or items or part or parts of "any bill making appropriations * * *." If the drafters of the constitution had intended the participial phrase "making appropriations of money or property embracing distinct items * * *" to modify the words "items or items or part or parts," Article 4, Section 9 would read, "In any bill, the governor shall have power to disapprove of any item or items or part or parts making appropriations of money or property, embracing distinct items * * *." The members of the Constitutional Convention did not draft Article 4, Section 9 in this way, and we hold that the Governor has the power to use his line-item veto for any portion of any bill making appropriations.
The Management Council has taken a lexical approach in endeavoring to persuade this Court that the constitutional provision is ambiguous. We are offered definitions of the words "item" and "part," and the point is made that the definitions are disparate, leading to a conclusion of ambiguity in the constitutional language. We are not persuaded that these definitions lead to ambiguity when the words are read in the context of the sentence. We are intrigued, however, that none of the parties wanted to deal with the definition of the word "any."
The word "any" is defined in WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 96 (1993) in this way:
1: one indifferently out of more than two: one or some indiscriminately of whatever kind: a: one or another: this, that, or the otherused as a function word esp. in interrogative and conditional expressions to indicate one that is not a particular or definite individual of the given category but whichever one chance may select b: one, no matter what one: EVERYused as a function word esp. in assertions and denials to indicate one that is selected without restriction or limitation of choice c: one or some of whatever kind or sort; esp: one or some however imperfeetused *845 as a function word to indicate one that is selected with indifference to quality 2: one, some, or all indiscriminately of whatever quantity: a: one or more: not noneused as a function word to indicate a positive but undetermined number or amount b: ALL-used as a function word to indicate the maximum or whole of a number or quantity c: a or some no matter how great or smallused as a function word to indicate what is considered despite its quantity or extent 3a: great, unmeasured, or unlimited in amount, quantity, number, time, or extent: up to whatever measure may be needed or desired b: appreciably or at all large, prolonged, or extended in amount, quantity, time, or extentused with a preceding negative .

BLACK'S LAW DICTIONARY 94 (6th ed.1990) contains this definition:
Any. Some; one out of many; an indefinite number. One indiscriminately of whatever kind or quantity. Federal Deposit Ins. Corporation v. Winton, C.C.A.Tenn., 131 F.2d 780, 782. One or some (indefinitely). Slegel v. Slegel, 135 N.J.Eq. 5, 37 A.2d 57, 58. "Any" does not necessarily mean only one person, but may have reference to more than one or to many. Doherty v. King, Tex.Civ.App., 183 S.W.2d 1004, 1007.
Word "any" has a diversity of meaning and may be employed to indicate "all" or "every" as well as "some" or "one" and its meaning in a, given statute depends upon the context and the subject matter of the statute. Donohue v. Zoning Bd. of Appeals of Town of Norwalk, 155 Conn. 550, 235 A.2d 643, 646, 647.
It is often synonymous with "either", "every", or "all". Its generality may be restricted by the context; thus, the giving of a right to do some act "at any time" is commonly construed as meaning within a reasonable time; and the words "any other" following the enumeration of particular classes are to be read as "other such like," and include only others of like kind or character.
The conclusion that must be drawn from these definitions is that the Constitutional Convention chose to vest in the Governor broad powers with respect to the partial veto authorized by Article 4, Section 9 of the Wyoming Constitution. An interpretation like that advocated by the Management Council results in substituting the word "only" for the word "any" the first time it appears in this provision.
Indeed, this is the effect of the argument by the Management Council that when all pertinent constitutional provisions are read together, in pari materia, Article 4, Section 9 of the Constitution of the State of Wyoming authorizes the Governor to veto only appropriations. Our cases explain that every statement in the constitution must be interpreted in light of the entire document. County Court Judges Ass'n, 752 P.2d at 964; Thomson v. Wyoming In-Stream Flow Committee, 651 P.2d 778, 790 (Wyo.1982); Bower v. Big Horn Canal Ass'n, 77 Wyo. 80, 307 P.2d 593, 597 (1957). The constitution should not be interpreted to render any portion of it meaningless, with all portions of it read in pari materia and every word, clause and sentence considered so no part will be inoperative or superfluous. Johnson v. State Hearing Examiner's Office, 838 P.2d 158, 165 (Wyo.1992). County Court Judges Ass'n, 752 P.2d at 964; Parker v. Energy Development Co., 691 P.2d 981, 986 (Wyo. 1984).
Appropriations are addressed in several sections in Article 3 of the Constitution of the State of Wyoming (emphasis added):
Section 22:
No bill for the appropriation of money, except for the expenses of the government, shall be introduced within five (5) days of the close of the session, except by unanimous consent of the house in which it is sought to be introduced.
Section 24:

*846 No bill, except general appropriation bills and bills for the codification and general revision of the laws, shall be passed containing more than one subject, which shall be clearly expressed in its title; but if any subject is embraced in any act which is not expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed.
Section 34:
The general appropriations bills shall embrace nothing but appropriations for the ordinary expenses of the legislative, executive and judicial departments of the state, interest on the public debt, and for public schools. All other appropriations shall be made by separate bills, each embracing but one subject.
Section 35:
Except for interest on public debt, money shall be paid out of the treasury only on appropriations made by the legislature, and in no case otherwise than upon warrant drawn by the proper officer in pursuance of law.
Section 36:
No appropriation shall be made for charitable, industrial, educational or benevolent purposes to any person, corporation or community not under the absolute control of the state, nor to any denominational or sectarian institution or association.
In the instant case, our interpretation of the clear language of Article 4, Section 9 of the Constitution of the State of Wyoming, authorizing the Governor to veto substantive provisions of a bill containing appropriations, does not render the plain meaning of any other constitutional provision inoperative or superfluous. The framers of our constitution uttered different expressions: bill for the appropriation of money; general appropriations bills; appropriations; and appropriations made by the legislature in Article 3 of the Wyoming Constitution. It follows that when the framers gave the governor the "power to disapprove of any item or items or part or parts of any bill making appropriations of money or property embracing distinct items * * *" in Article 4, Section 9, the framers contemplated giving the Governor broad veto authority. Our review of Article 4, Section 9 in pari materia, with all other provisions relating to appropriations, supports our holding that the Governor has authority to veto substantive provisions of any bill making appropriations, even though the vetoed substantive provision does not appropriate money.
In a separate segment of the Brief of Appellants, the Management Council explains the application of its construction of Article 4, Section 9 of the Constitution of the State of Wyoming with respect to each of the vetoes set forth in the Appendix. In view of our interpretation of the plain and unambiguous language of Article 4, Section 9, we need not address the perceived application of the Management Council's theory to each of the vetoed items or parts.
The first certified question:
1. Did the Governor have the power under Article 4, Section 9 of the Wyoming Constitution to veto portions of House Enrolled Act No. 2, enacted during the 1997 Special Session on School Finance Reform?
is answered "Yes."
The second certified question:
2. Do individual legislators or the Management Council of the Legislature have legal standing to sue the Governor regarding the exercise of his partial veto power under Article 4, Section 9 of the Wyoming Constitution?
is answered "Yes."
The case is remanded to the district court for further proceedings consistent with this opinion.

APPENDIX

Part I. 1997-1998 SCHOOL YEAR
 A. General Operations.
 XX-XX-XXX. Determination of amount to be included in foundation
 program for each district.
 XX-XX-XXX(b) partially vetoed ............................... ____

*847
Part II. STATE ADMINISTRATION
 D. State Education Technology Plan
 Section 210. Appropriation and Expenditure Requirements.
 Section 210(a)(i) partially vetoed .......................... ____
Part III. 1998-1999 SCHOOL YEAR
 A. Basket of Educational Goods and Services.
 Section 301(b) vetoed ....................................... ____
 B. General Operations1998-1999 School Year.
 2. Distribution and Administration of School Revenues
 XX-XX-XXX. Annual computation of district revenues.
 XX-XX-XXX(h) vetoed ...................................... ____
 39-2-402. Authorized mill levies.
 39-2-402(d)(i) partially vetoed .......................... ____
 3. Phase-In
 Section 306. 1998-1999 and following.
 Section 306(a)(i) & (ii) partially vetoed .................... ____
 Section 306(d) vetoed ........................................ ____
Part IV. 1999-2000 FUNDING FOR OPERATIONS
 No vetoes in this part of the bill.
Part V. PUBLIC EDUCATIONREFINEMENTS AND CONFORMING AMENDMENTS
 No vetoes in this part of the bill.
Part VI. GENERAL FISCAL PROVISIONS
 No vetoes in this part of the bill.
Part VII. EFFECTIVE DATES
 No vetoes in this part of the bill.
 [Part I. 1997-1998 SCHOOL YEAR]
 A. General Operations.
 Section 101. W.S. XX-XX-XXX(b)
 is amended to read:

XX-XX-XXX. Determination of amount to be included in foundation program for each district.
(b) The amount to be included in the foundation program of a district for transportation shall be seventy-five percent (75%) sixty-eight and five-tenths percent (68.5%) of the amount actually expended by the district during the previous school year for the operation and maintenance of transportation routes for the transportation of children. to and from regular school sessions, or seventy-five percent (75%) of one and four tenths (1.4) times the statewide average per route mile expenditure for all districts during the previous school year for the operation and maintenance of transportation routes for transporting children to and from regular school sessions, whichever is less. If the district is a member of a board of cooperative educational services which operates and maintains all transportation routes for the transportation of children to and from regular school sessions, the amount to be included in that district's foundation program for transportation shall be eighty percent (80%) of the eligible operation and maintenance costs of the routes for the previous school year.In addition, the foundation program transportation amount for each district shall include one-sixth (1/6) of the amount actually expended by the district during the previous four (4) years as transportation capital outlay for purchase or lease of all school busses meeting minimum design and operation standards imposed by regulation of the state department of education under W.S. 31-5-118. Only administration expenses directly related to transportation shall be included in the calculation of transportation costs. In addition, the state department of education shall by rule and regulation establish criteria *848 and standards for determining eligible operation and maintenance costs used in calculating transportation amounts under this subsection. If any district or districts form a board of cooperative educational services for the purpose of transportation, the state department of education shall report to the legislature annually the cost of the five percent (5%) incentive and the savings generated by the forming of the board for transportation purposes. Effective July 1, 1997, any modifications to computations under this subsection shall be submitted as recommendations in a report to the joint education interim committee, which may, after review, propose legislation to implement necessary modifications. Nothing in this subsection shall supersede rules and regulations promulgated under this subsection prior to July 1, 1997, except as otherwise provided in this subsection.
* * *

[Part II. STATE ADMINISTRATION]

* * *

D. State Education Technology Plan
* * *
Section 210. Appropriation and Expenditure Requirements.
(a) Three million seven hundred thousand dollars ($3,700,000.00) is appropriated from the general fund to the state superintendent for the development and implementation of the state education technology plan as established under W.S. 21-2-202(a)(xx). The legislature recognizes that this appropriation is the first phase of a five (5) year plan that is estimated to cost forty million dollars ($40,000,000.00). Expenditures under this section shall be subject to the following:
(i) The recommendations of the committee established by the governor and the state superintendent pursuant to Chapter 80, 1997 Sessions Laws, for purposes of implementing the communications system and contracting system components. These recommendations shall be submitted to the joint appropriations interim committee (JAC) during its hearings on the state's budget for the 1998 budget session. No funds appropriated under this section shall be expended until the 1998 general appropriations act (state budget bill) has been enacted into law. Expenditure of these funds shall be subject to terms and conditions contained in the 1998 general appropriations act (state budget bill) as enacted;
(ii) The student-to-computer ratio should be as low as feasible, but shall be within the range of four (4) students for every one (1) available computer to twelve (12) students for every one (1) available computer;
(iii) The costs of the plan shall be reduced by making the greatest use possible of existing computers and computer networks compatible with the statewide plan and capable of handling the data transmission brought to the schools pursuant to the statewide plan;
(iv) The implementation of the statewide plan shall be accomplished by:
(A) July 1, 1999, for data transmissions connectivity for every school with priority given to the wiring and connectivity for a necessary small school as defined by W.S. XX-XX-XXX; and
(B) July 1, 2001, for interactive two-way video capability within each high school.

[Part III. 1998-1999 SCHOOL YEAR]

A. Basket of Educational Goods and Services.

* * *
Section 301. (b) Effective July 1, 1997, any rules and regulations under subsection (a) of this section shall be submitted as recommendations in a report to the joint education interim committee, which may, after review, propose legislation to implement the provisions of this section. Nothing in this subsection shall supersede rules and regulations promulgated under this section prior to July 1, 1997, except as otherwise provided in this subsection.
* * *

*849 B. General Operations1998-1999 School Year.

* * *

2. Distribution and Administration of School Revenues
* * *
XX-XX-XXX. Annual computation of district revenues.
(a) To ensure revenues available to each district are uniformly sufficient to enable compliance with the uniform standards for educational programs prescribed under W.S. 21-9-101 and 21-9-102 and to secure state board accreditation of educational programs under W.S. 21-2-304(a)(ii), the revenues specified under this subsection shall be deemed state revenues and shall be considered in determining the amount to be distributed to each district under W.S. XX-XX-XXX. A district shall make an annual computation of the sum of local district resources, limited to the following revenues:
(ix) Seventy-five percent (75%) of The amount of tuition paid to the district during the previous school year, including any amount it may be required to charge charged under W.S. 21-4-501. No district shall include in its annual computation under this subsection any tuition paid to the district during the previous school year by another district for the education of pupils with any mental or physical handicap because of services available in the receiving district and any amount assessed in excess of the costs incurred for adult education programs, summer school programs, programs provided under an agreement for cooperative educational programs under W.S. XX-XX-XXX through XX-XX-XXX and any amount assessed for programs and services for children with disabilities;
(xi) Interest, capital gains and any other earnings on funds held by the district earned during the previous school year;
(xii) The district's share of interest and penalties on delinquent taxes under W.S. 39-3-101(b) and 39-5-101 distributed to it during the previous school year by the county treasurer;
(xiii) The district's share of railroad car company taxes distributed to it during the previous school year by the county treasurer under W.S. 39-2-207(e);
(xiv) Any amount received by the district during the preceding school year from the sale of real or personal property which was not owned by the district prior to July 1, 1997;
(xv) All other revenues received or collected by the district during the previous school year, but excluding any amount received from private contributions and gifts, excluding any revenues dedicated by law to the payment of bonded indebtedness and excluding fees or other charges imposed by the district for goods or services, such as rental fees and the price paid for admission into any place for recreation, entertainment or an athletic event. Upon application of a district, the department shall exclude from this paragraph revenue received by the district if the department finds that the revenue could not be used by the district to provide educational services to students.
(h) There is created the educational equity revenue program. In addition to all other mill levies authorized by law, each school district board of trustees is authorized to impose a levy of only two (2) additional mills for two (2) years under this subsection subject to the following:
(i) Each district imposing the levy under this subsection is entitled to receive an amount equal to the following:
(A) The ratio of the district's guaranteed amount to the total guaranteed amount for all districts in the state as computed under W.S. XX-XX-XXX(p); times
(B) One hundred fifty percent (150%) times two (2) mills times the statewide assessed valuation.
(ii) The state superintendent shall make payments to districts from the school foundation program to each district in amounts necessary to implement this paragraph. Payments necessary to implement this section shall be made under the same schedule *850 as other payments provided from the foundation program under W.S. XX-XX-XXX(c). Revenues actually received by the district from the levy under this subsection shall be counted toward the entitlement in paragraph (i) of this subsection. Districts shall rebate to the state foundation program amounts received in excess of the entitlement provided under this paragraph in accordance with the schedule specified in W.S. XX-XX-XXX(b) as it was in effect on July 1, 1997. This paragraph is subject to the following:
(A) The data used in making computations required under this paragraph shall be the same used for making other computations under W.S. XX-XX-XXX and XX-XX-XXX;
(B) Effective for each fiscal year beginning on and after July 1, 1998, on or before August 15 of each succeeding fiscal year, each district shall report the actual amount of revenue received from the levy under this subsection for the preceding fiscal year. If the revenues actually received are greater than the amount used in the computation for the entitlement under this subsection, the amount shall be considered a local revenue under W.S. XX-XX-XXX for the succeeding fiscal year. If the revenues actually received are less than the amount used in the computation for the entitlement under this subsection, the amount shall be paid to the district by August 15 of the succeeding fiscal year.
(iii) A board may approve this optional mill levy at a regular or special meeting following a public hearing announced by the board, which shall publish notice of intent to levy under this subsection two (2) additional mills for two (2) years for general operation in a newspaper of general circulation within the district at least ten (10) days prior to the hearing;
(iv) Revenues from the levy under this paragraph shall not be expended for capital construction or for capital facility repair, maintenance and renovation needs of the district, including deferred maintenance.
* * *
39-2-402. Authorized mill levies.
(d) There shall be annually levied and assessed upon the taxable value of property within the limits of Wyoming school districts the following school taxes when applicable:
(i) Not to exceed the number of mills provided by W.S. XX-XX-XXX and XX-XX-XXX(h);

3. Phase-In
Section 306. 1998-1999 and following.
(a) Notwithstanding W.S. XX-XX-XXX(p) as created in this act and using computations of district general fund revenues by the state department based upon reports from districts required by the department:
(i) For school year 1998-1999, revenues available to any school district shall not be more than one hundred fifteen percent (115%) nor less than ninety-five percent (95%) of the total general fund revenues available to that district during the 1997-1998 school year, except that any district imposing two (2) mills under the educational equity revenue program pursuant to W.S. XX-XX-XXX(h) shall receive not less than one hundred percent (100%) of the total general fund revenues available to that district during the 1997-1998 school year and the one hundred fifteen percent (115%) limit on the gain shall not apply;
(ii) For school year 1999-2000, revenues available to any school district shall not be more than one hundred fifteen percent (115%) nor less than ninety-five percent (95%) of the total general fund revenues available to that district during the 1998-1999 school year, except that any district imposing two (2) mills under the educational equity revenue program pursuant to W.S. XX-XX-XXX(h) shall receive not less than one hundred percent (100%) of the total general fund revenues available to that district during the 1998-1999 school year and the one hundred fifteen percent (115%) limit on the gain shall not apply.
(b) In addition to any other payment and for school years 1998-1999, three hundred *851 thousand dollars ($300,000.00) is appropriated from the general fund for boards of cooperative educational services such that each board of cooperative educational services providing services for children with disabilities shall receive up to one hundred thousand dollars ($100,000.00) during school year 1998-1999.
(c) The legislature recognizes that additional legislation in 1998 and 1999 will be necessary to fully comply with the court's decision, that it will take time for the state department of education to promulgate rules and regulations necessary to implement this act and such subsequent legislation, and that it will take additional time for school districts to fully comply with all such requirements. School districts shall continue to comply with existing state department of education standards during the transition to full implementation of school finance reform under this act. Nothing in this act shall be construed to require any district to be in full compliance with requirements that result from this act until the state department of education has promulgated necessary rules and regulations and a reasonable opportunity for districts to achieve compliance has been provided.
(d) Effective July 1, 1997, any rules and regulations under Section 303, 304 and 306 of this act shall be submitted as recommendations in a report to the select committee on school finance, which may, after review, propose legislation to implement the provisions of these sections. Nothing in this subsection shall supersede rules and regulations promulgated under Sections 303, 304 and 306 of this act prior to July 1, 1997, except as otherwise provided in this subsection.
* * *
NOTES
[1] The enacting clause for HEA 2 reads:

AN ACT relating to public schools; prescribing school reform in response to the supreme court decision in Campbell County School District, et al., v. State of Wyoming, et al.; authorizing limited local option ad valorem tax levies; modifying Wyoming school system provisions as specified; providing for appropriations; authorizing positions; and providing for effective dates.
[2] Article 4, Section 8 of the Constitution of the State of Wyoming provides: Every bill which has passed the legislature shall, before it becomes a law, be presented to the governor. If he approve, he shall sign it; but if not, he shall return it with his objections to the house in which it originated, which shall enter the objections at large upon the journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if it be approved by two-thirds of the members elected, it shall become a law; but in all such cases the vote of both houses shall be determined by the yeas and nays, and the names of the members voting for and against the bill shall be entered upon the journal of each house respectively. If any bill is not returned by the governor within three days (Sundays excepted) after its presentation to him, the same shall be a law, unless the legislature by its adjournment, prevent its return, in which case it shall be a law, unless he shall file the same with his objections in the office of the secretary of state within fifteen days after such adjournment.
[3] In order to furnish those not familiar with this matter pertinent information, there is attached to this opinion an Appendix setting forth the specific vetoes made by the Governor. There were seven parts in House Enrolled Act No. 2, but the vetoes occurred only in the first three parts of the bill. The appendix begins with a table of contents, and there follows the entire text of each section of the bill as to which a veto was made. This provides a general sense of the context of each veto, although a study of the entire bill would be appropriate for an in depth understanding of the significance of the vetoes.